### UNITED STATES v. ARMSTRONG et al.

(District Court, D. Indiana. May 26, 1920.)

No. 1446.

1. **Criminal law ☞13—Criminal statute must be clear and definite.**
   In general, a criminal statute, to be valid, must be so clearly and definitely expressed that an ordinary man can determine in advance whether his contemplated act is within or without the law, and, if deviation from a standard is prohibited, the standard must be definitely fixed.

2. **Criminal law ☞13—Section 9 of the Federal Control Act not fatally indefinite.**
   Act Aug. 10, 1917, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛i), providing that any person who conspires, etc., to limit the facilities for transporting, producing, manufacturing, or dealing in necessaries, or to restrict the supply or distribution of necessaries, or to prevent, limit, or lessen the manufacture and production of necessaries to enhance the price, shall be punished, is not invalid for indefiniteness and uncertainty.

3. **Constitutional law ☞251—"Due process of law" means the same in different amendments.**
   The words "due process of law" have the same meaning in the Fifth and Fourteenth Amendments to the Constitution.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Due Process of Law.]

4. **Constitutional law ☞257—Due process requires valid statute defining crime.**
   The due process clause of Const. Amend. 5, requires that no person shall be deprived of his liberty as punishment for crime, but by virtue of a valid constitutional statute defining the crime, as the statute upon which a person is deprived of his liberty is a part of the process of law used against him.

5. **Constitutional law ☞257—Arbitrary classification in criminal statute denies due process.**
   An arbitrary classification by Congress in a criminal statute violates the due process clause of Const. Amend. 5.

6. **Constitutional law ☞257—Classification in criminal statute must not be arbitrary.**
   Under Const. Amend. 5, the classification in a criminal statute must rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without such basis.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**7. Constitutional law ⊂⊃258—Certain sections of Food Control Act held to deny due process.**

Act Aug. 10, 1917, § 4 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ff), as amended by Act Oct. 22, 1919, making it unlawful to destroy necessaries, commit waste, hoard or monopolize necessaries, or make any unjust or unreasonable rate or charge, etc., and section 26 (section 3115⅛qq), prohibiting the destruction of necessaries by persons carrying on or employed in interstate or foreign commerce, violate Const. Amend. 5, as to due process, because of the provisos therein exempting farmers, gardeners, co-operative societies, etc., from their provisions, as such classification is arbitrary, and not natural or reasonable.

**8. War ⊂⊃4—Original section 4 of Food Control Act cannot be basis of criminal prosecution.**

Act Aug. 10, 1917, § 4 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ff), as originally enacted, making it unlawful to destroy necessaries, commit waste, hoard, or monopolize necessaries, or make unjust or unreasonable rates or charges, etc., is insufficient on which to found a criminal charge, as it provides no penalty, and the statute contains no general penalty clause.

**9. War ⊂⊃4—Congress may within reasonable limits prescribe duration of war legislation.**

If, under the war power, Congress had power to pass Act Aug. 10, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛e–3115⅛kk, 3115⅛l–3115⅛r), it had within reasonable limits the power to provide when it should cease to be in force.

**10. War ⊂⊃4—Recital that state of war exists fixes existence, so far as Congress may do so.**

So far as a state of war may be fixed by act of Congress such state existed at least until October 22, 1919, in view of the recital of the existence of a state of war in the act of that date amending Act Aug. 10, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛e–3115⅛kk, 3115⅛l–3115⅛r).

**11. War ⊂⊃4—Termination of Food Control Act does not affect previous violations.**

Assuming that a state of war ceased to exist when the armistice was signed and announced to Congress by the President, the termination thereby of Act Aug. 10, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛e–3115⅛kk, 3115⅛l–3115⅛r), does not affect offenses committed prior to that time, in view of section 24 (section 3115⅛pp), providing that offenses committed, and penalties, forfeitures, or liabilities incurred, prior to the termination of such act, may be prosecuted or punished as if the act had not been terminated.

**12. Conspiracy ⊂⊃25—Indictment for conspiracy to commit offense consisting of conspiracy will be quashed.**

A count in an indictment charging a conspiracy under Criminal Code, § 37 (Comp. St. § 10201), to violate Act Aug. 10, 1917, § 9 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛i), will be quashed, as it charges a conspiracy to commit the offense of conspiracy.

Criminal prosecution by the United States against James M. Armstrong and others. On motion to quash the indictment. Motion granted as to certain counts, and overruled as to others.

Frederick Van Nuys, U. S. Atty., of Indianapolis, Ind., and Dan W. Simms, Sp. Asst. U. S. Atty., of Lafayette, Ind., and L. Ert Slack, Sp. Asst. U. S. Atty., of Indianapolis, Ind.

Charles E. Hughes, of New York City, Henry Warrum, Miller, Dailey & Thompson, Miller & Dowling, and Bingham & Bingham, all

of Indianapolis, Ind., Harold A. Henderson and James A. Cooper, Jr., both of Terre Haute, Ind., and Hays & Hays, of Sullivan, Ind., for defendants.

ANDERSON, District Judge. The indictment in this case is based upon sections 4, 9, and 26 of the original act of Congress, approved August 10, 1917, known as the Lever Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛ff, 3115⅛i, 3115⅛qq), and upon section 4 of said act as amended October 22, 1919 (41 Stat. 298). These sections are as follows:

"Sec. 4. That it is hereby made unlawful for any person willfully to destroy any necessaries for the purpose of enhancing the price or restricting the supply thereof; knowingly to commit waste or willfully to permit preventable deterioration of any necessaries in or in connection with their production, manufacture, or distribution; to hoard, as defined in section 6 of this act, any necessaries; to monopolize or attempt to monopolize, either locally or generally, any necessaries; to engage in any discriminatory and unfair, or any deceptive or wasteful practice or device, or to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries; to conspire, combine, agree, or arrange with any other person, (a) to limit the facilities for transporting, producing, harvesting, manufacturing, supplying, storing, or dealing in any necessaries; (b) to restrict the supply of any necessaries; (c) to restrict distribution of any necessaries; (d) to prevent, limit, or lessen the manufacture or production of any necessaries in order to enhance the price thereof; or (e) to exact excessive prices for any necessaries, or to aid or abet the doing of any act made unlawful by this section."

"Sec. 9. That any person who conspires, combines, agrees, or arranges with any other person (a) to limit the facilities for transporting, producing, manufacturing, supplying, storing, or dealing in any necessaries; (b) to restrict the supply of any necessaries; (c) to restrict the distribution of any necessaries; (d) to prevent, limit, or lessen the manufacture or production of any necessaries in order to enhance the price thereof shall, upon conviction thereof, be fined not exceeding $10,000 or be imprisoned for not more than two years, or both."

"Sec. 26. That any person carrying on or employed in commerce among the several States, or with foreign nations, or with or in the territories or other possessions of the United States in any article suitable for human food, fuel, or other necessaries of life, who, either in his individual capacity or as an officer, agent, or employé of a corporation or member of a partnership carrying on or employed in such trade, shall store, acquire, or hold, or who shall destroy or make away with any such article for the purpose of limiting the supply thereof to the public or affecting the market price thereof in such commerce, whether temporarily or otherwise, shall be deemed guilty of a felony and, upon conviction thereof, shall be punished by a fine of not more than $5,000 or by imprisonment for not more than two years, or both: Provided, that any storing or holding by any farmer, gardener, or other person of the products of any farm, garden, or other land cultivated by him shall not be deemed to be a storing or holding within the meaning of this act: Provided further, that farmers and fruit growers, co-operative and other exchanges, or societies of a similar character shall not be included within the provisions of this section: Provided further, that this section shall not be construed to prohibit the holding or accumulating of any such article by any such person in a quantity not in excess of the reasonable requirements of his business for a reasonable time or in a quantity reasonably required to furnish said articles produced in surplus quantities seasonally throughout the period of scant or no production. Nothing contained in this section shall be construed to repeal the act entitled 'An act to protect trade and commerce against unlawful restraints and monopolies,' approved July second, eighteen hundred and ninety, commonly known as the Sherman Anti-Trust Act."

Amended section 4 is the original section 4 with the following addition thereto:

"Any person violating any of the provisions of this section upon conviction thereof shall be fined not exceeding $5,000 or be imprisoned for not more than two years, or both: Provided, that this section shall not apply to any farmer, gardener, horticulturist, vineyardist, planter, ranchman, dairyman, stockman, or other agriculturist, with respect to the farm products produced or raised upon land owned, leased, or cultivated by him: Provided further, that nothing in this act shall be construed to forbid or make unlawful collective bargaining by any co-operative association or other association of farmers, dairymen, gardeners, or other producers of farm products with respect to the farm products produced or raised by its members upon land owned, leased, or cultivated by them."

The indictment contains 18 counts. Count 1 is based upon subdivision (a) of section 9; count 2, upon (b) of 9; count 3, upon (c) of 9; count 4, upon (d) of 9; count 5, upon subdivision (a) of amended section 4; count 6, upon (b) of amended section 4; count 7, upon (c) of amended section 4; count 8, upon (d) of amended section 4; count 9, upon (e) of amended section 4; count 10, upon (e) of original section 4; count 16, upon subdivision (a) of amended section 4; count 17, upon subdivision (a) of section 9; count 18, upon subdivision (a) of amended section 4. Counts 11, 12, 13, 14, and 15, charge a conspiracy under section 37 of the Criminal Code (Comp. St. § 10201) to violate various provisions of the Lever Act. Section 37, so far as applicable here, provides:

"If two or more persons conspire * * * to commit any offense against the United States, * * * and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

Count 11 charges a conspiracy to violate subdivision (e) of original section 4; count 12, a conspiracy to violate original section 4; count 13, a conspiracy to violate section 4 as amended; count 14, a conspiracy to violate section 26; and count 15, a conspiracy to violate subdivision (a) of section 9. Section 9 of the original act was repealed by the amending act of October 22, 1919, but the amending act provides that:

"Any offense committed in violation of said section * * * 9, prior to the passage of this act, may be prosecuted and the penalties prescribed therein enforced in the same manner and with the same effect as if this act had not been passed."

It is urged that section 4, both in its original and in its amended forms, and sections 9 and 26 of the Lever Act, are repugnant to the Fifth and Sixth Amendments to the federal Constitution. The clause of the Fifth Amendment relied on is:

"No person shall, * * * be deprived of life, liberty, or property, without due process of law."

And that of the Sixth Amendment is:

"In all criminal prosecutions, the accused shall enjoy the right * * * to be informed of the nature and cause of the accusation."

Under these clauses of Amendments 5 and 6 it is urged: (a) That all of the sections of the Lever Act relied upon by the government are so indefinite, vague, and uncertain that a prosecution under either of them would deprive the defendants of their liberty without due process of law, and that they are repugnant to the guaranty in the Sixth Amendment that the accused shall be informed of the nature and cause of the accusation against him; and (b) that amended section 4 and section 26 violate the Fifth Amendment, in that each of them contains an arbitrary classification, which classification is repugnant to the "due process" clause of the Fifth Amendment. This contention is based upon the provisos in amended section 4 and section 26 above set out.

It is further urged that section 4 in its original form, in addition to being indefinite, vague, and uncertain, prescribes no penalty, and therefore is insufficient upon which to found a criminal prosecution.

## (a) *As to indefiniteness and uncertainty:*

[1] In general, it may be said that a criminal statute, to be valid, must be so clearly and definitely expressed that an ordinary man can determine in advance whether his contemplated act is within or without the law. On the other hand, it must not be so broad and elastic in its terms as to compel a man to guess at his peril whether a jury may think his act is in violation of it, and, if deviation from a standard is prohibited, the standard must be definitely fixed. In Railway Co. v. Dey (C. C.) 35 Fed. 866, 1 L. R. A. 744, Justice Brewer said:

"No penal law can be sustained unless its mandates are so clearly expressed that any ordinary person can determine in advance what he may and what he may not do under it."

In Tozer v. United States (C. C.) 52 Fed. 917, he further said:

"In order to constitute a crime, the act must be one which the party is able to know in advance whether it is criminal or not. The criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable. There must be some definiteness and certainty."

In United States v. Brewer, 139 U. S. 278, on page 288, 11 Sup. Ct. 538, on page 541 (35 L. Ed. 190), the Supreme Court said:

"Laws which create crime ought to be so explicit that all men subject to their penalties may know what acts it is their duty to avoid. United States v. Sharp, Pet. C. C. 118. Before a man can be punished, his case must be plainly and unmistakably within the statute. United States v. Lacher, 134 U. S. 624, 628."

The difficulty is in applying the rule. The government relies upon Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232. The indictment in that case was for a conspiracy to violate the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830). The contention was made that the statute was so vague as to be inoperative on its criminal side. This contention was based upon the decisions in the cases of Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734 and United States v. American Tobacco Co., 221 U. S.

106, 31 Sup. Ct. 632, 55 L. Ed. 663, where the rule of reason was applied in construing the Sherman Act. In the Nash Case the court said:

"Those cases may be taken to have established that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interest by unduly restricting competition or unduly obstructing the course of trade"

—and thus construed, held that there was no constitutional difficulty in the way of enforcing the criminal part of the act.

The defendants insist that the cases of International Harvester Co. v. Kentucky, 234 U. S. 216, 34 Sup. Ct. 853, 58 L. Ed. 1284, and Collins v. Commonwealth of Kentucky, 234 U. S. 634, 34 Sup. Ct. 924, 58 L. Ed. 1510, condemn the statutes under consideration. In these two cases the court had before it a statute of Kentucky which made criminal a combination or agreement to fix, control or regulate the price of any commodity or article, by raising or depreciating, or attempting to raise or depreciate, it above or below its real value, and condemned the statute, in the last case saying:

"The statute in its reference to 'real value' prescribed no standard of conduct that it was possible to know."

But the case of Waters-Pierce Oil Co. v. Texas, 212 U. S. 86, 29 Sup. Ct. 220, 53 L. Ed. 417, points out the distinction that may be drawn between the cases. On page 108 of 212 U. S., on page 226 of 29 Sup. Ct. (53 L. Ed. 417), it is said:

"It is further insisted that the acts in question are so vague, indefinite, and uncertain as to deprive them of their constitutionality, in that they punish by forfeiture of the right to do business, and the imposition of penalties, under provisions of an act which do not advise a citizen or corporation, prosecuted under them, of the nature and character of the acts constituting a violation of the law. These objections are found in the words of the act of 1899, denouncing contracts and arrangements 'reasonably calculated' to fix and regulate the price of commodities, etc. And in the act of 1903 acts are prohibited which 'tend' to accomplish the prohibited results. It is insisted that these laws are so indefinite that no one can tell what acts are embraced within their provisions."

After referring to the decisions by Justice Brewer, above cited, the court continued:

"But the * * * statutes in question do not give the broad power to a court or jury to determine the criminal character of the act in accordance with their belief as to whether it is reasonable or unreasonable, as do the statutes condemned in the cases cited"

—and the statutes were upheld, the court further saying:

"It is not uncommon in criminal law to punish not only a completed act, but also acts which attempt to bring about the prohibited result."

[2] By reason of the conclusions that I have reached upon other grounds as to the validity of section 4, and the constitutional objections to amended section 4 and section 26, it is only necessary to consider whether section 9 is subject to the charge of indefiniteness and uncertainty. Section 9 does not contain any such words as "discrimina-

tory," "unfair," "deceptive," "wasteful," "unjust," "unreasonable," or "excessive." In my judgment, it meets the requirements of the law, as stated by Judge Brewer and by the Supreme Court in 139 U. S. 278, 11 Sup. Ct. 538, 35 L. Ed. 190, above cited, and is abundantly sustained by the Nash Case and the Waters-Pierce Oil Case.

(b) *As to the validity of amended section 4 and section 26, in view of the provisos therein:*

Under this head it is urged that each of these sections contains an arbitrary classification, and that Congress is precluded by the Fifth Amendment, as are the states by the Fourteenth Amendment, from making such classification. In other words, the defendants claim such classification is repugnant to the "due process" clause of the Fifth Amendment. The Fourteenth Amendment, so far as relevant to this discussion, provides:

"Nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

The "due process" clause of the Fifth Amendment, as we have seen, is as follows:

"No person shall * * * be deprived of life, liberty, or property, without due process of law."

What do the words "due process of law" mean? It has been many times held that "due process of law" and "law of the land" express the same thought and have the same meaning. In Davidson v. New Orleans, 96 U. S. 97, 101 (24 L. Ed. 616), Justice Miller said:

"The equivalent of the phrase 'due process of law,' according to Lord Coke, is found in the words 'law of the land,' in the Great Charter, in connection with the writ of habeas corpus, the trial by jury, and other guaranties of the rights of the subject against the oppression of the crown."

And in Missouri Pacific Railway Co. v. Humes, 115 U. S. 512, 519, 6 Sup. Ct. 110, 112 (29 L. Ed. 463), Justice Field said:

"In England the requirement of due process of law, in cases where life, liberty and property were affected, was originally designed to secure the subject against the arbitrary action of the crown, and to place him under the protection of the law. The words were held to be the equivalent of 'law of the land.' And a similar purpose must be ascribed to them when applied to a legislative body in this country; that is, that they are intended, in addition to other guaranties of private rights, to give increased security against the arbitrary deprivation of life or liberty, and the arbitrary spoliation of property."

Judge (afterward Justice) Jackson, in Scott v. City of Toledo (C. C.) 36 Fed. 385, 393 (1 L. R. A. 688), citing Cooley, Const. Lim. 432, said:

"In a general sense, 'due process of law' is identical in meaning with the phrase 'law of the land,' as used in the constitutions of the several states."

It has been repeatedly held that the phrase "law of the land," as used in state Constitutions, imports a general public law, equally binding upon every member of the community, which embraces all persons

265 F.—44

who are in or may come into like situation and circumstances, and not partial laws affecting the rights of classes of individuals, and, when applied to special or class legislation, it means in addition that "the classification must be natural and reasonable, not arbitrary and capricious."

[3] By the simplest and plainest rules of construction, the words "due process of law" must have the same meaning in the Fifth and the Fourteenth Amendments. This has been so stated in Hurtado v. California, 110 U. S. 516, 4 Sup. Ct. 111, 292, 28 L. Ed. 232. There the court had before it the question whether or not a statute of California, authorizing prosecutions for felonies by information, without indictment by a grand jury, was repugnant to the "due process" clause of the Fourteenth Amendment, and after comparing the two amendments, calling attention to the provision for indictment by a grand jury in the Fifth Amendment, said:

"The natural and obvious inference is that in the sense of the Constitution, 'due process of law' was not meant or intended to include, ex vi termini, the institution and procedure of a grand jury in any case. The conclusion is equally irresistible, that when the same phrase was employed in the Fourteenth Amendment to restrain the action of the states, it was used in the same sense and with no greater extent."

The Supreme Court has repeatedly been called upon to decide whether certain classifications in state statutes were reasonable or arbitrary, and whether they were in conflict with the Fourteenth Amendment. In Caldwell v. Texas, 137 U. S. 692, 697, 11 Sup. Ct. 224, 226 (34 L. Ed. 816) the court had before it the validity of a state statute under this amendment, and it said:

"By the Fourteenth Amendment the powers of the states in dealing with crime within their borders are not limited, but no state can deprive particular persons or classes of persons of equal and impartial justice under the law. Law, in its regular course of administration through courts of justice, is due process, and when secured by the law of the state, the constitutional requisition is satisfied. 2 Kent, Comm. 13. And due process is so secured by laws operating on all alike, and not subjecting the individual to the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice. Bank of Columbia v. Okely, 4 Wheat. 235, 244."

In Leeper v. Texas, 139 U. S. 462, 11 Sup. Ct. 577, 35 L. Ed. 225, with the like question before it, the court said:

"It must be regarded as settled  *  *  *  that by the Fourteenth Amendment the powers of states in dealing with crime within their borders are not limited, except that no state can deprive particular persons, or classes of persons, of equal and impartial justice under the law; that law in its regular course of administration through courts of justice is due process, and when secured by the law of the state the constitutional requirement is satisfied; and that due process is so secured by laws operating on all alike, and not subjecting the individual to the arbitrary exercise of the powers of government unrestrained by the established principles of private right and distributive justice. Hurtado v. California, 110 U. S. 516, 535, and cases cited."

And in Giozza v. Tiernan, 148 U. S. 657, 13 Sup. Ct. 721, 37 L. Ed. 599, the Supreme Court said again:

"Due process of law, within the meaning of the amendment, is secured if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of government."

McGehee on Due Process of Law, p. 60, says:

"Purely arbitrary decrees or enactments of the Legislature directed against individuals or classes are held not to be 'the law of the land,' or to conform to 'due process of law.' "

And Willoughby on the Constitution, pp. 873, 874, says:

"The United States is not by the Constitution expressly forbidden to deny to any one the equal protection of the laws, as are the states by the first section of the Fourteenth Amendment. It would seem however, that the broad interpretation which the prohibition as to 'due process of law' has received is sufficient to cover very many of the acts which, if committed by the states, might be attacked as denying equal protection. Thus it has been repeatedly declared that enactments of a Legislature directed against particular individuals or corporations, or classes of such, without any reasonable ground for selecting them out of the general mass of individuals or corporations, amounts to a denial of due process of law so far as their life, liberty or property is affected. One of the requirements of due process of law, as stated by the Supreme Court, is that the laws 'operate on all alike,' and do not subject the individual to an arbitrary exercise of the powers of government."

[4] Whenever the government undertakes to deprive a person of his liberty, as a punishment for crime, it must do it by virtue of a valid, constitutional statute defining the crime, and such a statute is required by the "due process" clause of the Fifth Amendment. The statute upon which a person is deprived of his liberty is a part of the process of law which is used against him, and it must be "due process of law." In speaking of the "due process" clause of the Fifth Amendment, the Supreme Court, in Murray's Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 276 (15 L. Ed. 372), said:

"The article is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave Congress free to make any process 'due process of law,' by its mere will."

[5] Hence I conclude that an arbitrary classification by Congress is repugnant to the "due process" clause of the Fifth Amendment. The power to make an arbitrary classification is arbitrary power, and arbitrary power has no place in our system of government. Ours is a government of law, not of men.

[6] Is the classification in amended section 4 and in section 26 reasonable or arbitrary? The mere fact of classification is not sufficient.

"It must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis." Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 560, 22 Sup. Ct. 431, 439 (46 L. Ed 679) ; Gulf, etc., Ry. Co. v. Ellis, 165 U. S. 150, 165, 17 Sup. Ct. 255, 41 L. Ed. 666.

In the Connolly Case the court was dealing with the Anti-Trust Act of Illinois (Laws 1893, p. 182), condemning trusts or combinations

or conspiracies to limit production, prevent competition, and fix prices. Section 9 of the act provided:

"The provisions of this act shall not apply to agricultural products or live stock while in the hands of the producer or raiser."

In holding the classification to be arbitrary the court said:

"We have seen that under the statute all except producers of agricultural commodities and raisers of live stock, who combine their capital, skill, or acts for any of the purposes named in the act, may be punished as criminals, while agriculturists and live stock raisers, in respect of their products or live stock in hand, are exempted from the operation of the statute, and may combine and do that which, if done by others, would be a crime against the state. The statute so provides notwithstanding persons engaged in trade or in the sale of merchandise and commodities, within the limits of a state, and agriculturists and raisers of live stock, are all in the same general class; that is, they are all alike engaged in domestic trade, which is, of right, open to all, subject to such regulations, applicable alike to all in like conditions, as the state may legally prescribe."

No case has been called to my attention wherein the doctrine here laid down, upon the question as to what is arbitrary classification, has been modified. The Connolly Case has been frequently cited in cases where the question was up, but the cases have been distinguished from it, while the doctrine of the case has been left unimpaired.

[7] Now, let us apply the rule of this case to amended section 4. The Lever Act is entitled:

"An act to provide further for the national security and defense by encouraging the production, conserving the supply, and controlling the distribution of food products and fuel."

In the first section of the act (section 3115⅛e), "foods, feeds and fuel" are called necessaries, and the prohibitions are as to necessaries thus defined. By amended section 4 farmers, gardeners, horticulturists, vineyardists, planters, ranchmen, dairymen, stockmen, and other agriculturists—persons who produce foods and feeds—with respect to the products produced or raised upon land owned, leased, or cultivated by them, may willfully destroy such foods and feeds for the purpose of enhancing the price or restricting the supply thereof, may knowingly commit waste or willfully permit preventable deterioration of such foods and feeds in or in connection with their production, manufacture or distribution, may hoard such products, may monopolize or attempt to monopolize such products, may engage in any discriminatory and unfair, or any deceptive or wasteful practice or device, or may make any unjust or unreasonable rate or charge in handling or dealing in or with such products, and may conspire, combine, agree, or arrange with any other person to limit the facilities for producing, or to restrict the supply, or to restrict the distribution, or to prevent, limit, or lessen the production in order to enhance the price, or exact excessive prices for such products, with impunity, while all other persons are to be punished as criminals for doing the same acts, including those who produce, supply, or distribute the other necessary, fuel. The section so provides notwithstanding the fact that the excepted and the included persons are all in the same general class; that is,

they are all alike engaged in producing, handling, and distributing necessaries—foods, feeds, and fuel. The constitutional warrant for this legislation is found in the grant of power to Congress to declare war, to raise and support armies, and to provide and maintain a navy. Those who produce foods to feed the soldiers and sailors, those who produce feeds to feed the horses and mules required by the army, and those who produce fuel to transport the soldiers and propel the ships of the navy, are all alike helping to win the war, and are all alike in the same general class.

The second proviso in amended section 4, that "nothing in this act shall be construed to forbid or make unlawful collective bargaining by any co-operative association or other association of farmers, dairymen, gardeners, or other producers of farm products with respect to the farm products produced or raised by its members upon land owned, leased, or cultivated by them," is as unwarranted as the one just considered. The indulgence to the excepted class is in respect to the farm products produced or raised upon land owned, leased, or cultivated by the members of it. But this does not differentiate the instant case from the Connolly Case, for there the exception was to apply to "agricultural products or live stock while in the hands of the producer or raiser." My conclusion is that the classification in amended section 4 is arbitrary and not natural or reasonable; that such section is repugnant to the "due process" clause of the Fifth Amendment, and is therefore void.

[8] I further conclude that original section 4 is insufficient to found a criminal charge upon, because there is no penalty provided for the violation of it. It does not of itself create an offense, as that word is used in the criminal law, and there is no general penalty clause in the statute to cover it.

Section 26 deals with persons carrying on or employed in commerce among the several states, in any article suitable for human food, fuel, or other necessaries of life, and it prohibits the storing, acquiring, holding, or destroying of any such article for the purpose of limiting the supply thereof to the public or affecting the market price thereof in such commerce. The first proviso excepts farmers, gardeners, and other persons as to the products of land cultivated by them, and is objectionable for the same reasons given above in considering a similar exception in amended section 4.

The second proviso, "that farmers and fruit growers, co-operative and other exchanges, or societies of a similar character shall not be included within the provisions of this section," carves out an excepted class for which no reasonable basis can be seen. This proviso is not limited to the necessaries produced by the excepted class, but it applies to farmers, fruit growers, co-operative and other exchanges, or societies of a similar character, without reference to where or by whom the necessaries are produced. These persons are set apart as a favored class, and are given the privilege of storing, acquiring, holding, or destroying necessaries for the purpose of limiting the supply thereof to the public or affecting the market price thereof in interstate commerce, without any restraint whatever, while all other persons who

commit such acts are to be punished as criminals. It is arbitrary legislation and cannot stand. Section 26 is therefore void.

While apparently conceding that Congress, under the war power, could validly enact the Lever Act at the time of its passage, defendants contend that it does not follow that the act continues in force, regardless of an actual condition of peace, until Congress sees fit to terminate its operation. Section 24 of the act (section 3115⅛pp) provides:

"The provisions of this act shall cease to be in effect when the existing state of war between the United States and Germany shall have terminated, and the fact and date of such termination shall be ascertained and proclaimed by the President."

[9] This would seem to be a reasonable provision. If Congress had the power to pass the act, it had, at least within reasonable limitations, the power to provide when the act should cease to be in force. The Constitution vests in Congress the power to declare war. Under this power, in April, 1917, Congress declared a state of war to exist. The original Lever Act, approved August 10, 1917, and the amendment to that act approved October 22, 1919, each, in the first sentence of the first section, recites:

"That by reason of the existence of a state of war, it is essential," etc.

[10] So far as a state of war may be fixed by act of Congress, it is plain that such state existed, at least until October 22, 1919. Each of the counts based on section 9 fixes the time of the offenses charged as between August 10, 1917, and October 22, 1919. There is no attempt in these counts to charge any acts committed after October 22, 1919.

[11] Not only so, but section 24 further provides:

"But the termination of this act shall not affect any act done, or any right or obligation accruing or accrued, or any suit or proceeding had or commenced in any civil case before the said termination pursuant to this act; but all rights and liabilities under this act arising before its termination shall continue and may be enforced in the same manner as if the act had not terminated. Any offense committed and all penalties, forfeitures, or liabilities incurred prior to such termination may be prosecuted or punished in the same manner and with the same effect as if this act had not been terminated."

Under this, even if a state of war ceased to exist when the armistice was signed and announced to Congress by the President, the act was at least in force until then; and if the act terminated then, by the provisions of section 24 such termination could not affect offenses committed before that time, and the counts last mentioned charge offenses committed between the date of the act and the signing of the armistice in November, 1918. This matter appears to have been settled by the Supreme Court in the cases of Hamilton v. Kentucky Distilleries & Warehouse Co. and Dryfoos et al. v. Edwards, 251 U. S. 146, 40 Sup. Ct. 106, 64 L. Ed. ——, decided December 15th last. The act of Congress involved in those cases was passed 10 days after the signing of the armistice. All of the arguments as to the

cessation of actual war were pressed upon the court in those cases and held to be insufficient.

[12] It follows from the above considerations that all the counts of the indictment based upon original section 4 and section 4 as amended and section 26—that is, counts 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16,. and 18—should be quashed, because they are each founded upon invalid statutes. Count 15 charges a conspiracy under section 37 to violate subdivision (a) of section 9. This count charges a conspiracy to commit the offense of conspiracy and should be quashed. Counts 1, 2, 3, 4, and 17 charge violations of the several subdivisions of section 9, and the motion to quash them should be overruled.

It is so ordered.