[Crim. No. 2636. In Bank.—May 29, 1924.]

## In the Matter of the Application on Behalf of GEVINO RAMERIZ for a Writ of Habeas Corpus.

[1] CONSTITUTIONAL LAW—POLICE POWER—DEFINITION.—"Police power is the power inherent in a government to enact laws within constitutional limits to protect the order, safety, health, morals and general welfare of society."

[2] ID.—POLICE POWER—REGULATION OF FIREARMS—POWER OF LEGISLATURE.—It is a well-recognized function of the legislature in the exercise of the police power to restrain dangerous practices and to regulate the carrying and use of firearms and other weapons in the interest of the public safety.

[3] ID. — OWNERSHIP AND POSSESSION OF FIREARMS — INHIBITION AGAINST UNNATURALIZED FOREIGN-BORN PERSONS—POLICE POWER—FOURTEENTH AMENDMENT OF FEDERAL CONSTITUTION. — The enactment of section 2 of the act of 1923 (Stats. 1923, p. 695), declaring that "no unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person," constitutes a proper exercise of the police power and is not invalid under the fourteenth amendment of the constitution of the United States.

[4] ID.—FIREARMS—LEGISLATURE—EVIDENCE—ASSUMPTION.—It cannot be assumed that the legislature did not have evidence before it,

---

3. Constitutionality of statutes restricting right of aliens to bear arms, note, 24 A. L. R. 1119.

or that it did not have reasonable grounds to justify the legislation contained in the act of 1923 (Stats. 1923, p. 695), as, for instance, that unnaturalized foreign-born persons and persons who have been convicted of a felony are more likely than citizens to unlawfully use firearms or engage in dangerous practices against the government in times of peace or war, or to resort to force in defiance of the law.

[5] ID.—DIFFERENCE IN PENALTIES PRESCRIBED BY ACT OF 1923—JUSTIFICATION FOR.—The provision for a different and more severe punishment for a violation of section 2 of the act of 1923 (Stats. 1923, p. 695) than is prescribed by section 5 of said act, which makes it a misdemeanor for any person, citizen or otherwise, to have the possession of the kind of firearms therein described without a license, may be upheld upon the ground that the respective criminal acts in sections 2 and 5 are not of the same import, and upon the assumption that the legislature regarded the possession of concealed weapons by aliens of graver consequence than in the case of citizens having such possession without a license.

[6] ID.—RIGHT TO BEAR ARMS—SECOND AMENDMENT OF FEDERAL CONSTITUTION—APPLICABILITY OF.—The second amendment of the constitution of the United States that "A well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed," offers no protection against the exercise of power by the state governments but applies only to the exercise of power by the federal government.

[7] ID.—RIGHT TO BEAR ARMS—STATE CONSTITUTIONAL PROVISION—EXTENT OF.—The right to keep and bear arms as guaranteed by a state constitutional provision similar to the federal amendment refers only to the bearing of arms by the citizens in defense of a common cause, and not to their use in private broils and affrays.

[8] ID.—RIGHT TO BEAR ARMS—ENACTMENT OF LAWS BY LEGISLATURE.—Although state constitutions declare that every citizen has the right to bear arms, in defense of himself and the state, and do not expressly or by implication deny to the legislature the right to enact laws in regard to the manner in which arms shall be borne, such regulation may be prescribed, and the absence of such a guarantee in the state constitution leaves the legislature entirely free to deal with the subject of bearing arms.

[9] ID.—PRIVATE PROPERTY RIGHTS—SECTION 17, ARTICLE I, STATE CONSTITUTION—NONINFRINGEMENT OF.—The legislation contained in the act of 1923 (Stats. 1923, p. 695) coming within the police power and being a reasonable exercise thereof, and in view of the principle of law that private property rights of individuals are required to yield when in conflict with reasonable police regulations, the rights of private property under section 17 of article I of the state constitution are not infringed by said act of 1923.

PROCEEDING in Habeas Corpus to secure release from custody on a charge of violating section 2 of the act of 1923 (Stats. 1923, p. 695). Writ discharged.

The facts are stated in the opinion of the court.

Bradley & Bradley for Petitioner.

U. S. Webb, Attorney-General, W. F. Cleary, Deputy Attorney-General, and William R. McKay, District Attorney, for Respondent.

J. J. Henderson, Ben P. Tabor and Gearhart, Carling & Cummings, *Amici Curiae.*

LAWLOR, J.—On application of his attorneys a writ of *habeas corpus* was issued on behalf of Gevino Rameriz, whom we shall refer to as petitioner. The record before us shows that he was charged, tried, and convicted in Kings County and sentenced to serve a term of from one to five years in the state prison at San Quentin for violation of a new statute (Stats. 1923, p. 695), in having on and about his person and in his possession a certain automatic revolver some four inches in length of twenty-five caliber and loaded with powder and ball, the petitioner then and there being an unnaturalized foreign-born person. After judgment was pronounced a certificate of probable cause was issued pending appeal and at the time of the issuance of the writ the petitioner was in the custody of respondent, W. J. Hime, sheriff of Kings County.

The petitioner was charged under section 2 of the said statute, which reads as follows:

"On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person. The terms 'pistol,' 'revolver,' and 'firearms capable of being concealed upon the person' as used in this act shall be construed to

apply to and include all firearms having a barrel less than twelve inches in length. Any person who shall violate the provisions of this section shall be guilty of a felony and upon conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.''

It is contended that this statute is unconstitutional (a) in that it violates the fourteenth amendment of the constitution of the United States, (b) because it violates section 1, article II, amendments of the constitution of the United States, and (c) for the reason that it violates section 17, article I, of the constitution of the state of California.

(a) It is contended that this statute violates the fourteenth amendment of the federal constitution in that it denies to aliens equal rights and the protection of the laws. In other words, that aliens have been unjustly discriminated against within the meaning of the fourteenth amendment. It is argued on behalf of the petitioner that the deprivation of the right to unnaturalized foreign-born persons to have the possession of such firearms as are described in the statute is an unconstitutional exercise of the police power of this state. It is admitted by *amici curiae* that the legislature has the unquestioned power to enact, as a proper police regulation designed to promote the public safety and welfare, a law absolutely prohibiting any and all persons within its jurisdiction the possession or use of weapons of the character described in the act under consideration, but ''that so long as the Legislature expressly recognizes the class of firearms described in Section 2 of the Act as the subject of property, ownership and possession by citizens of the United States, it cannot deny to resident foreigners the absolute right to acquire and own and, as a corollary to such ownership, the right to possess, under proper regulation, firearms of the same description.''

Respondent does not claim that the protection afforded by the fourteenth amendment does not extend to aliens within the territorial jurisdiction, but contends that within the exercise of the police power they may be classified for purposes of legislation. It is argued on the other hand, firstly, that unlawful discrimination is shown in the proviso contained in section 6 that nothing in section 5 ''shall be construed to apply to or affect sheriffs . . . nor to the possession or transporta-

tion by any merchant of unloaded firearms or merchandise" and that, consequently, "no unnaturalized foreign born merchant, who happens to be engaged in business in the State of California, is permitted to possess or transport a certain kind of property if it consists wholly or partly of firearms capable of being concealed on the person." Secondly, it is argued, "there is no provision in the law whereby an unnaturalized foreign born person, no matter what his status may be, can secure a license or permit to own or possess any firearm or stock-in-trade consisting of firearms. The mere fact that he is an unnaturalized foreigner absolutely precludes him from owning or possessing this species of property. . . . Interpreted according to their ordinary signification, the words of the statute prohibit even the owning by an unnaturalized foreigner of any firearm capable of being concealed on the person. In other words, every unnaturalized foreign born person, resident in the State of California, was required, the instant this statute took effect, to rid himself of the ownership of any such firearm which he theretofore owned, and was prohibited from acquiring the ownership of any such firearm in the future." Petitioner further complains in his brief that section 5 of the act, which makes it a misdemeanor only for any person to carry such weapons as are described without a license is added evidence of unlawful discrimination. The following is quoted from the brief: "A penal statute which makes arbitrary distinctions between different persons or classes of persons, either by making certain acts criminal offenses when committed by some persons but not when committed by others, or by prescribing different penalties for the commission of the same acts by different persons has been declared unconstitutional as class legislation. *Peonage Cases,* 123 Fed. 671; 12 C. J. 1141."

The attorney-general contends that the legislation does not violate the equal protection clause of section 1 of the fourteenth amendment, and cites section 1, article XIX, of the state constitution that "The legislature shall prescribe all necessary regulations for the protection of the state, . . . from the burdens and evils arising from the presence of aliens who are or may become . . . criminals, . . . and from aliens otherwise dangerous or detrimental to the well-being or peace of the state, . . . ," as additional authority

for such legislation as contained in section 2 of the act in question. We quote: "It also appears to us that in order to hold the act in question unconstitutional, it will be necessary for this court to hold that Section 1 of Article XIX of our State constitution violates the equal protection clause of the fourteenth amendment to the Constitution of the United States."

Petitioner has cited a number of authorities to the effect that certain statutes and ordinances which discriminated against aliens were repugnant to the fourteenth amendment: *Yick Wo* v. *Hopkins,* 118 U. S. 356 [30 L. Ed. 220, 6 Sup. Ct. Rep. 1064]; *Barbier* v. *Connolly,* 113 U. S. 27 [28 L. Ed. 923, 5 Sup. Ct. Rep. 357]; *Truax* v. *Raich,* 239 U. S. 33 [Ann. Cas. 1917B, 283, L. R. A. 1916D, 545, 60 L. Ed. 131, 36 Sup. Ct. Rep. 7, see, also, Rose's U. S. Notes]; *In re Parrott,* 1 Fed. 481, and *In re Opinion of Justices,* 207 Mass. 601 [34 L. R. A. (N. S.) 604, 94 N. E. 558]. In the Yick Wo case a municipal ordinance to regulate public laundries and requiring the consent of the board of supervisors to their establishment when the building was not made of brick and stone was held unconstitutional and not a valid exercise of the police power for the reason that it allowed arbitrary and unjust discrimination to be made by such board founded on differences of race, between persons otherwise in similar circumstances. In *Barbier* v. *Connolly, supra,* the ordinance fixing certain hours when laundries were not to be operated was held to be a reasonable police regulation. *Truax* v. *Raich, supra,* dealt with a statute which required that employers employ only a specified number of alien employees and fixing a penalty. The statute was declared unconstitutional as infringing the right to earn a livelihood. *In re Parrott, supra,* involved an article of the state constitution which authorized restrictive legislation relating to the employment of Chinese. It was held invalid as violative of the fourteenth amendment and not within the police power of the state. A criminal statute in *In re Opinion of Justices, supra,* attempted to prevent Chinese from admitting into hotels and restaurants conducted by them or their serving with food and drink therein girls under the age of twenty-one years. It was held such restrictions denied to persons of the Chinese race the equal protection of the laws. The case of *Commonwealth* v. *Hana,*

195 Mass. 262 [122 Am. St. Rep. 251, 11 Ann. Cas. 514, 11 L. R. A. (N. S.) 799, 81 N. E. 149], also cited by petitioner, held a statute which required that a license as a hawker and peddler shall be granted only to a person who is or has declared his intention to become a citizen of the United States, a valid exercise of the police power. The following cases are cited as instances of the denial of the equal protection of the laws: *Pearson* v. *City of Portland,* 69 Me. 278 [31 Am. Rep. 276]; *In re Kemmler,* 136 U. S. 436 [34 L. Ed. 519, 10 Sup. Ct. Rep. 930]; *Strauder* v. *West Virginia,* 100 U. S. 303 [25 L. Ed. 664]; *McCabe* v. *Atchison, T. & S. F. Ry. Co.,* 235 U. S. 151 [59 L. Ed. 169, 35 Sup. Ct. Rep. 69, see, also, Rose's U. S. Notes]; *City of Pasadena* v. *Stimson,* 91 Cal. 238 [27 Pac. 604]; *In re Kotta,* 187 Cal. 27, 33 [200 Pac. 957]; *St. Louis Southwestern R. Co.* v. *Arkansas,* 235 U. S. 350 [59 L. Ed. 265, 35 Sup. Ct. Rep. 99, see, also, Rose's U. S. Notes]. In *Pearson* v. *City of Portland, supra,* a statute which precluded the recovery by a nonresident of damages for injury to person or property under circumstances sanctioned by another state law if a similar remedy was not provided in the place of residence of the injured party was held to deny him the equal protection of the laws. *In re Kemmler, supra,* involved a state electrocution law. The court held that no federal question was presented because the due process clause of the fourteenth amendment has reference to the law of the land in each state, and so long as the law is equal in its operation it does not violate due process. The legislation in *Strauder* v. *West Virginia, supra,* which denied to negroes the right and privilege of participating in the administration of the laws as jurors was held unconstitutional under the fourteenth amendment as being a discrimination against negroes on account of race and color. In *McCabe* v. *Atchison, T. & S. F. Ry. Co., supra,* a statute requiring separate, but equal, accommodations on railways for members of the white and African races was held not to be an infraction of the equal protection clause of the fourteenth amendment. In *City of Pasadena* v. *Stimson, supra,* it was held that a statute which requires cities of the fifth and sixth classes to make an effort to agree upon a price with the owners of land sought to be condemned before instituting condemnation proceedings was a special law making

a forbidden discrimination against two classes of municipal corporations and denying them the equal privileges with other cities in the exercise of the right of eminent domain. *In re Kotta, supra,* was a case where a statute imposed a poll tax upon unnaturalized foreigners. This was held unconstitutional on the ground that the enforcement would deprive the persons so burdened of the equal protection of the laws guaranteed by the fourteenth amendment. In *St. Louis Southwestern R. Co.* v. *Arkansas, supra,* a statute imposed an annual franchise tax upon the right to exist as a corporation, and the court said it was not within the fourteenth amendment, since nothing therein prevents double taxation or any other form of unequal taxation so long as the inequality is not based on arbitrary distinctions. The following cases are cited as instances where statutes deprived persons of property without due process of law: In *Stimson Mill Co.* v. *Braun,* 136 Cal. 122 [89 Am. St. Rep. 116, 57 L. R. A. 726, 68 Pac. 481]; the statute provided that mechanics' liens except as to contractors be payable in money; *Coppage* v. *Kansas,* 236 U. S. 1 [L. R. A. 1915C, 960, 59 L. Ed. 441, 35 Sup. Ct. Rep. 240, see, also, Rose's U. S. Notes], a statute making it unlawful for an employer to require an employee to agree not to become a member of any labor organization during the time of employment; *Hannah* v. *People,* 198 Ill. 77 [64 N. E. 776], dealt with restrictions on the conduct of public warehousemen; in *Missouri* v. *Lewis,* 101 U. S. 22 [25 L. Ed. 989], a constitutional amendment and state statute adjusted the appellate jurisdiction of the courts in the various counties of the state, and this was held not to violate any provision of the fourteenth amendment; *Rathbone* v. *Wirth,* 150 N. Y. 459 [34 L. R. A. 408, 45 N. E. 15], held that certain legislation which made party affiliations a requisite to eligibility to an office violated the state constitution. The following cases cited by petitioner involved the police power of the states: *Mugler* v. *Kansas,* 123 U. S. 623 [31 L. Ed. 205, 8 Sup. Ct. Rep. 273, see, also, Rose's U. S. Notes], held that a state statute prohibiting the sale of intoxicating liquor did not violate the fourteenth amendment, as that guarantee does not deprive the states of any police power; *Lochner* v. *New York,* 198 U. S. 45 [3 Ann. Cas. 1133, 49 L. Ed. 937, 25 Sup. Ct. Rep. 539, see, also, Rose's U. S. Notes], a law which fixed the hours of

labor in a bakery, was held unconstitutional as not constituting a valid exercise of the police power, the health of the individual following the occupation not being jeopardized by the employment in question; in *Lacey* v. *Palmer*, 93 Va. 159 [57 Am. St. Rep. 795, 31 L. R. A. 822, 24 S. E. 930], a statute regulating pool-selling, was held to be within the police power of the state; *Ex parte Hayden*, 147 Cal. 649 [109 Am. St. Rep. 183, 1 L. R. A. (N. S.), 184, 82 Pac. 315], passed on a statute requiring all fruit shipped to be labeled with the county and locality where grown—held an unconstitutional invasion of liberty and not a proper exercise of the police power under the guise of a health regulation; *Eubank* v. *Richmond*, 226 U. S. 137 [Ann. Cas. 1914B, 192, 42 L. R. A. (N. S.), 1123, 57 L. Ed. 156, 33 Sup. Ct. Rep. 76, see, also, Rose's U. S. Notes], involved a municipal ordinance requiring the establishment of building lines on the request of two-thirds of the owners of abutting property. It was held the ordinance did not constitute a valid exercise of the police power, as it could not serve the public safety, convenience, or welfare.   It will serve no purpose to discuss *Title Guarantee & Trust Co.* v. *Garrott*, 42 Cal. App. 152.[183 Pac. 470], and *Ex parte Bailey*, 155 Cal. 472 [132 Am. St. Rep. 95, 31 L. R. A. (N. S.) 534, 101 Pac. 441].

The foregoing authorities have been described somewhat in detail by way of making clear their inapplicability to the legislation here involved.  In other words, we have found nothing in any of them that supports the contention that section 2 of the act is violative of the fourteenth amendment.   Correct principles are stated as applied to the legislation to which these cases were addressed, and they furnish the tests by which the constitutionality of legislation may be determined under the fourteenth amendment, but there were involved in none of them the subjects of public peace, public safety, public security, or collateral subjects as affected by the possession of firearms.  One of these tests is whether the legislation comes within the police power, and several of the cases are authority for the proposition that the fourteenth amendment was not "designed to interfere with the power of the State, sometimes termed its police power . . . " (*Barbier* v. *Connolly*, 113 U. S. 27, 31 [28 L. Ed. 923, 5 Sup. Ct. Rep. 357, see, also, Rose's

U. S. Notes]). The precise question presented here is whether section 2 is a valid exercise of the police power.

Respondent urges that the legislation represents a proper exercise of the police power for the reason that it tends to safeguard the public peace and security. The argument is twofold: (1) Allegiance to the government, that is, the "danger of permitting aliens to arm themselves, and thus place themselves in a position to dispute, with force of arms, the sovereignty of our nation and our people. While such a danger may seem improbable at the present time, yet, in the time of war, it becomes very real danger indeed, particularly as a few thousand organized aliens, in the course of a few hours, could so cripple our basic industries and our transportation facilities as to make us practically powerless in conducting war. . . . On the other hand, firearms, and particularly firearms capable of being concealed upon the person, are capable of being put into active and immediate use. . . . Thus, even though the possession of firearms by any person may be harmful to the public welfare, yet as the possession of such weapons by an alien is doubly harmful, . . . it is within the province of the legislature to confine its restrictions to aliens." (2) Here follows an argument in favor of the legislation, giving illustrations of the need of guarding against aliens, which concludes thus: "There is yet another reason for the classification: the additional difficulty in apprehending and securing evidence against aliens." *Amicus curiae* for respondent makes a similar argument and concludes that the classification is not unreasonable.

Among the cases relied upon by respondent are *Patsone* v. *Pennsylvania,* 232 U. S. 138 [58 L. Ed. 539, 34 Sup. Ct. Rep. 281], and *State* v. *Rheaume,* 80 N. H. 319 [116 Atl. 758]. The former case upheld the constitutionality of an act which made it unlawful for any unnaturalized foreign-born resident to kill any wild bird or animal except in defense of person or property, and "to that end" made it unlawful for such foreign-born person to own or be possessed of a shotgun or rifle. It is sought on behalf of petitioner to distinguish this case on the ground that the decision "seemed to hinge upon the provisions of the Act and especially of the phrase 'to that end,' that is, to the protection and preservation of wild game." It is claimed the federal court

did not squarely decide the question of whether or not ownership of shotguns and rifles by foreigners could be prohibited *for other purposes*, and the following excerpt from the opinion is quoted: "It will be time enough to consider whether the statute can be construed or upheld as precluding Italians from possessing a stock of guns for purposes of trade when such a case is presented. The act was passed for an object with which possession in the way of trade has nothing to do, and well might be interpreted as not extending to it."

Concerning the question of discrimination, the decision in *Patsone* v. *Pennsylvania, supra,* declared: "The discrimination undoubtedly presents a more difficult question. But we start with the general consideration that a state may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. A lack of abstract symmetry does not matter. The question is a practical one dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named. . . . The question therefore narrows itself to whether this court can say that the Legislature of Pennsylvania was not warranted in assuming as its premise for the law that resident unnaturalized aliens were the peculiar source of the evil that it desired to prevent. . . . Obviously the question so stated is one of local experience on which this court ought to be very slow to declare that the state legislature was wrong in its facts." This well-established principle was applied in *Miller* v. *Wilson,* 236 U. S. 373 [L. R. A. 1915F, 829, 59 L. Ed. 628, 35 Sup. Ct. Rep. 342, see, also, Rose's U. S. Notes], where a California statute limiting hours of employment of women in specified occupations, including those in hotels, was upheld. The court said: "Dealing with practical exigencies, the legislature may be guided by experience. . . . It is free to recognize degrees of harm, and it may confine its restrictions to those classes of cases where the need is deemed to be clearest. . . . If the law presumably

hits the evil where it is most felt, it is not to be overthrown because there are other instances to which it might have been applied.''

*State* v. *Rheaume, supra,* sustained as constitutional a statute requiring persons not citizens of the United States to make application for a permit to possess firearms. Petitioner, referring to the differentiation in the respective statutes as regulatory and prohibitory, says: ''It will be noticed that in two essential respects it is radically different from the California law. In the first place, no attempt is made to deny to foreign born residents of the State of New Hampshire the right to acquire or own property in firearms; and, in the second place, no attempt is made to prohibit such unnaturalized foreign born residents from possessing such firearms provided they comply with certain regulations and procure permits therefor. . . . From the foregoing it will be seen that the New Hampshire law merely regulates the possession and use of firearms. It makes no attempt to deny to anyone, resident within the state, the right to acquire or own property in such firearms. It does not even prohibit the possession of firearms by foreigners, but merely provides that any foreigner desiring to possess the same, shall first submit to certain regulations and procure a permit for such purpose. The law, moreover, makes no attempt to disturb the ownership of firearms by any class of persons who owned the same at the time the law took effect. The California law, on the other hand, at its very inception seeks to deprive persons who owned firearms at the time of such enactment, of their property in such firearms. In this phase it is retroactive in its effect and unquestionably deprives persons resident in the State of California of their property without due process of law. . . . Under no circumstances does it permit any unnaturalized foreigner either to own or possess a firearm or firearms of the description denounced by the statute, and, in this respect, it unjustly, oppressively and without reason, deprives the class of the population of the rights guaranteed them by the Federal Constitution.''

The point to that case is not whether the legislation was merely regulatory or prohibitory. It is conceded by *amici curiae* for petitioner that firearms are the proper subject of the exercise of the police power. The question presented

here is whether, in the exercise of the police power, the
segregation of aliens constitutes an unlawful discrimination
against that class. It was said in *State* v. *Rheaume, supra*:
"Classifications distinguishing between citizens and aliens
have, not infrequently, been the basis of regulations under
the police power of the states. . . . Aliens are under no
special constitutional protection which forbids a classification
otherwise justified simply because the limitation of the class
falls along the lines of nationality. That would be requir-
ing a higher degree of protection for aliens as a class than
for similar classes of American citizens. . . . It therefore
remains to be considered whether there is such a relation
between the restriction as to the alien and the public safety
as to warrant the classification in the present case. . . . That
explosives and firearms are proper subjects of regulation is
self-evident. The Legislature was dealing with subject-mat-
ters of great inherent danger to the public. . . . It was an in-
cident to such a system that a classification should be made,
based on domicile, allegiance, duty, habit, temperament, and
other characteristics which distinguish the citizen and appli-
cant for citizenship from the alien who has manifested no
desire or intention to bind himself to support the govern-
ment. Citizens as a class have more settled domiciles, and
are better known to the local police officials, while the sojourn
of aliens in this country, in theory, and usually in practice,
is temporary, and their abode, while here, capricious and
uncertain. Citizens, by means of taxation, bear the expense
of the government and of police protection, while the alien
does not necessarily pay taxes or share any part of the
public burden. Native citizens are justly presumed to be
imbued with a natural allegiance to their government which
unnaturalized foreigners do not possess. The former inherit
a knowledge and reverence for our institutions, while the
latter as a class do not understand our customs or laws, or
enter into the spirit of our social organization. Or, passing
more directly to the use of firearms, the citizen has an ob-
ligation to defend the state, while the alien has none. The
citizen is required to assist in maintenance of order, the
enforcement of law, and the arrest of wrongdoers in some
instances. It is clear that there exists a reasonable and sub-
stantial basis for the classification."

Moreover, it is not strictly true that the legislation here in question is prohibitory to every class of firearms. Under the statute aliens may own or have in their possession firearms, provided they are not of a size capable of being concealed on the person. This would permit aliens to have shotguns, rifles, or other large weapons for all lawful purposes.

The case of *People* v. *Crane*, 214 N. Y. 154 [Ann. Cas. 1915B, 1254, L. R. A. 1916D, 550, 108 N. E. 427], approves a similar classification of aliens. The statute there, known as the New York Labor Law (L. 1909, c. 36, Consol. Laws, c. 31), provided that in the construction of public works by a state, municipality, or by contractors, only United States citizens shall be employed and that citizens of the state should be given preference. Numerous cases are cited therein in which the power of a state to discriminate in favor of citizens was sanctioned. Among these are *McCready* v. *Virginia*, 94 U. S. 391 [24 L. Ed. 248], where a state denied to aliens, and even to citizens of another state, the right to plant oysters or to fish in public waters, and *Geer* v. *Connecticut*, 161 U. S. 519 [40 L. Ed. 793, 16 Sup. Ct. Rep. 600, see, also, Rose's U. S. Notes], where the state restricted to its own citizens the enjoyment of its game. The principle that justified the discrimination in all these cases was held to be "that the common property of the state belongs to the people of the state and hence that in any distribution of that property, the citizen may be preferred." It was said in *People* v. *Crane, supra*: "If the calling is one that the state, in the exercise of its police power, may prohibit either absolutely, or conditionally by the exaction of a license, the fact of alienage may justify a denial of the privilege. . . . There must, however, be some relation in such cases between the exclusion of the alien and the protection of the public welfare."

In *Ex parte Maier*, 103 Cal. 476 [42 Am. St. Rep. 129, 37 Pac. 402], a writ of *habeas corpus* was issued. The petitioner was held in custody on a complaint charging him with a misdemeanor under section 626 of the Penal Code in unlawfully selling a quantity of deer meat, the meat having been cut from the carcass of a deer killed in Texas and brought into this state. Petitioner contended that as the above section did not prohibit the sale of deer meat lawfully

taken without the state the charge did not come within the terms thereof. It was also argued that the act violates the constitution of the United States in that it is an attempt to regulate interstate commerce. In discharging the writ and remanding the prisoner it was held that it is within the police power of the state, in the protection of the wild game thereof, to prohibit the sale of the meat of any wild game within the state, and that such a police regulation making it a public offense to buy and sell deer meat within the state, which was cut from an entire carcass brought from without the state, is not a violation of the constitution of the United States as an attempt to regulate interstate commerce. "The fact that a regulation may incidentally, and to a certain extent, affect commerce between the states, does not affect its validity. . . . The authority of Congress over any article of commerce imported into a state ceases 'when the importer has so acted upon it, that it has become incorporated and mixed up with the mass of property in the country, which happens when the original package is no longer such in his hands,' and thereupon the property becomes subject to the jurisdiction of the state, and affected and controlled by its regulations."

A classification of aliens has been made with respect to procuring a license to hunt and fish upon payment of a fee. The Statutes of 1909, page 663, amending a similar act (Stats. 1907, p. 247), requires every person in the state, who hunts, pursues or kills any of the wild birds or animals, excepting predatory birds or animals, to first procure a license therefor. A license to citizens of the United States and resident in this state may be issued on the payment of one dollar; to any citizen of the United States and not a resident of this state on the payment of ten dollars; to any person not a citizen of the United States upon the payment of twenty-five dollars. In the Statutes of 1919, page 119, a further classification was made allowing a license to be issued to a person who shall have declared his intention to become a citizen of the United States and who is a resident of this state, on the payment of ten dollars, provided that the applicant take an oath that he has not claimed his citizenship in a foreign country as a basis for avoiding service in the armed forces of the United States. Fishing licenses, by Statutes 1913, page 986, may be granted to citi-

zens and residents of this state on the payment of one dollar, to citizens of the United States and not residents of this state, on the payment of three dollars, and to persons not citizens of the United States on the payment of three dollars. We do not find that these provisions have been made the subject of attack on the point of differentiation in the amount of the fee required.

In *Commonwealth* v. *Hana, supra,* in holding constitutional that part of the act which provided that a license of a hawker and peddler shall be granted only to a person who is, or shall have declared his intention to become a citizen of the United States and referring to *State* v. *Montgomery,* 94 Me. 192 [80 Am. St. Rep. 386, 47 Atl. 165], which declared a similar statute unconstitutional, the court said: "There is, however, an important question which was not much discussed in that case, whether the Legislature, in the exercise of the police power, could discover a reason for withholding peddlers' licenses from aliens. The business of peddling furnishes such opportunities for the practice of fraud that it is a proper subject for legislative regulation. . . . If, in the same interest [protection of the public], the Legislature deems it important that licenses shall be granted only to citizens of the United States, or to those who have declared their intention to become citizens, it can hardly be said that they have exceeded their constitutional right in passing a law to that effect. . . . Indeed, the nature of their business is such that their possession of a domicile and citizenship in this country might be important to those seeking remedies for wrongs done in their business." *Terrace* v. *Thompson,* 263 U. S. 197 [68 L. Ed. ——, 44 Sup. Ct. Rep. 15], involved the Alien Land Law of the state of Washington (Laws 1921, c. 50), prohibiting the purchase or lease of land by any alien who has not declared his intention to become a citizen. In holding that the legislation was not repugnant to the fourteenth amendment the court approved the following statement from the decision of the district court in that case (274 Fed. 841) : "It is obvious that one who is not a citizen and cannot become one lacks an interest in, and the power to effectually work for the welfare of, the state, and, so lacking, the state may rightfully deny him the right to own and lease real estate within its boundaries. If one incapable of citizenship may lease or

own real estate, it is within the realm of possibility that every foot of land within the state might pass to the ownership or possession of noncitizens." In *Porterfield* v. *Webb*, 263 U. S. 225 [68 L. Ed. ——, 44 Sup. Ct. Rep. 21], the court considered the right of a citizen to lease his land to a Japanese subject under the Alien Land Law of this state (Stats. 1921, p. lxxxiii), forbidding aliens ineligible to citizenship to acquire, possess, or enjoy agricultural land. It was said in upholding the legislation that "Our decision in *Terrace* v. *Thompson, supra,* controls the decision of all questions raised here." *Webb* v. *O'Brien,* 263 U. S. 313 [68 L. Ed. ——, 44 Sup. Ct. Rep. 112], dealt with the right of a citizen as affected by the Alien Land Law to enter into a cropping contract with a Japanese subject living in California. The court said: "The provision of the act which limits the privilege of ineligible aliens to acquire real property or any interest therein to that prescribed by treaty is not in conflict with the Fourteenth Amendment. *Terrace* v. *Thompson, supra; Porterfield* v. *Webb,* 263 U. S. 225 [68 L. Ed. ——, 44 Sup. Ct. Rep. 21]." Another case under the Alien Land Law is *Frick* v. *Webb,* 263 U. S. 326, [68 L. Ed. ——, 44 Sup. Ct. Rep. 115], which involved the ownership of stock by a Japanese subject in the Merced Farm Company, a corporation of this state. The court held that "The state has power, and the act evidences its purpose, to deny to ineligible aliens permission to own, lease, use or have the benefit of lands within its borders for agricultural purposes. . . . It may forbid indirect as well as direct ownership and control of agricultural land by ineligible aliens."

It may safely be assumed that in a general sense the reasons that induced legislation involved in the case at bar exerted an influence in the adoption of the enactments considered in the foregoing authorities. If rights in land may be denied to aliens by the state there would seem no reason why in the exercise of its police power it might not also protect itself against the ownership, traffic in and use of firearms by aliens. This inhibition might well tend to conserve peace and quiet, and in times of war as well as of peace serve to avoid the injection of such issues into the international relations of the federal government.

[1] "Police power is the power inherent in a government to enact laws, within constitutional limits, to protect the order,

safety, health, morals and general welfare of society." (12 C. J. 904.) [2] It is a well-recognized function of the legislature in the exercise of the police power to restrain dangerous practices (Id. 916) and to regulate the carrying and use of firearms and other weapons in the interest of the public safety (Id. 917). .

[3] In our opinion the legislation constitutes a proper exercise of the police power and is not invalid under the fourteenth amendment. The purpose of the act is to conserve the public welfare, to prevent any interference with the means of common defense in times of peace or war, to insure the public safety by preventing the unlawful use of firearms. [4] It cannot be assumed that the legislature did not have evidence before it, or that it did not have reasonable grounds to justify the legislation, as, for instance, that unnaturalized foreign-born persons and persons who have been convicted of a felony were more likely than citizens to unlawfully use firearms or engage in dangerous practices against the government in times of peace or war, or to resort to force in defiance of the law. To provide against such contingencies would plainly constitute a reasonable exercise of the police power.

[5] As to the point that different and more severe punishment is provided for the same offense by section 2 than by section 5 of the act, it is to be noted that the respective sections prescribe different offenses. Section 5 provides it shall be a misdemeanor for any person within the state to carry concealed on his person or within any vehicle which is under his control or direction any pistol, revolver, or other firearm capable of being concealed upon the person without having a license to carry such firearm. The gravamen of that offense is for any person, citizen or otherwise, to have the possession of the kind of firearms described without a license. In *Pace* v. *Alabama,* 106 U. S. 583 [27 L. Ed. 207, 1 Sup. Ct. Rep. 637, see, also, Rose's U. S. Notes], the court held: "Equality of protection means that persons shall not be subjected, for the same offense, to any greater or different punishment." In that case a heavier penalty was prescribed when the crime of adultery was committed by a white person and a negro than in a case where the crime was committed by persons of the same race and color. It is apparent that the respective criminal acts in sections

2 and 5 are not of the same import, and so far as the penalty is concerned it may be assumed that the legislature regarded the possession of concealed weapons by aliens of graver consequence than in the case of citizens having such possession without a license.

(b) The second point is that the right of the people to bear arms is infringed by this statute. The second amendment of the constitution of the United States is as follows: "A well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."

[6] It will suffice to state that this point is without merit, since this amendment offers no protection against the exercise of power by the state governments but applies only to the exercise of power by the federal government. The right of the people to keep and bear arms is not a right granted by the constitution. "Neither is it in any manner dependent upon that instrument for its existence. The second amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the amendments that has no other effect than to restrict the powers of national government," and not those of the state. (*United States* v. *Cruikshank*, 92 U. S. 542, 553 [23 L. Ed. 588]. See, also, *Miller* v. *Texas*, 153 U. S. 535 [38 L. Ed. 812, 14 Sup. Ct. Rep. 874.) It was said in *Spies* v. *Illinois* (*Re Spies*), 123 U. S. 131, 166 [31 L. Ed. 80, 8 Sup. Ct. Rep. 21, 22, see, also, Rose's U. S. Notes], "that the first ten articles of amendment were not intended to limit the powers of the state governments in respect to their own people, but to operate on the national government alone, was decided more than half a century ago, and that decision has been steadily adhered to since." (See, also, *Presser* v. *Illinois*, 116 U. S. 252, 265 [29 L. Ed. 615, 6 Sup. Ct. Rep. 580, see, also, Rose's U. S. Notes].) If there is an inhibition upon the legislature it must be found in the state constitution, and not in the second amendment of the federal constitution. The constitution of this state contains no provision on the subject. [7] An examination of the numerous authorities in various states will show that the right to keep and bear arms as guaranteed by a state constitutional provision similar to the federal amendment refers only to the bearing of arms by the citi-

zens in defense of a common cause, and not to their use in private broils and affrays. Thus, it is not an invasion of the right to make it unlawful for any person to carry a dirk, sword cane, Spanish stiletto, or other similar weapon. (*Aymette* v. *State*, 2 Humph. (Tenn.) 154; *State* v. *Wilburn*, 7 Baxt. (Tenn.) 57 [32 Am. Rep. 551]; *Andrews* v. *State*, 3 Heisk. (Tenn.) 165 [8 Am. Rep. 8]; *English* v. *State*, 35 Tex. 473 [14 Am. Rep. 374]; *State* v. *Workman*, 35 W. Va. 367 [14 L. R. A. 600, 14 S. E. 9].) It may be remarked that an absolute prohibition of such right might be held to infringe a fundamental right. In *Nunn* v. *Georgia*, 1 Ga. 243, the court said: "We are of the opinion then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defense, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the constitution, and void; and that, as the defendant has been indicted and convicted for carrying a pistol, without charging that it was done in a concealed manner, under that portion of the statute which entirely forbids its use, the judgment of the court below must be reversed, and the proceeding quashed." [8] It appears that although state constitutions declare that every citizen has the right to bear arms, in defense of himself and the state, and do not expressly or by implication deny to the legislature the right to enact laws in regard to the manner in which arms shall be borne, such regulation may be prescribed, and the absence of such a guarantee in the state constitution leaves the legislature entirely free to deal with the subject of bearing arms.

[9] (c) The conclusions that the legislation comes within the police power and that it is a reasonable exercise thereof render unnecessary any discussion of the last point that rights of private property under section 17, article I, of the state constitution are infringed by the statute in question, since the principle of law that private property rights of individuals are required to yield when in conflict with reasonable police regulations is applicable (5 Cal. Jur. 882).

Writ discharged and petitioner remanded.

Waste, J., Richards, J., Seawell, J., and Myers, C. J., concurred.