ROK v. LEGG.
No. 265–Y.

District Court, S. D. California, Central Division.
April 17, 1939.

244

Julius A. Leibert, Gallagher, Wirin & Johnson, and A. L. Wirin, all of Los Angeles, Cal., for plaintiff.

Ben Harrison, U. S. Atty., and Irl D. Brett and James L. Crawford, Asst. U. S. Attys., all of Los Angeles, Cal., for defendant.

YANKWICH, District Judge.

Section 11 of the Emergency Relief Appropriation Act of 1938, as amended by joint resolution of the 76th Congress, First Session, 53 Stat. 508, 15 U.S.C.A. § 728 note, reads:

"Section 11. No alien shall be given employment or continued in employment on any project prosecuted under the appropriations contained in the Emergency Relief Appropriation Act of 1938 or this joint resolution: Provided, That no part of the money herein appropriated shall be available to pay any person thirty days after the approval of this joint resolution who does not make affidavit as to United States citizenship, such affidavit to be considered prima facie evidence of such citizenship."

The resolution was approved by the President of the United States on February 4, 1939, and went into effect on March 4, 1939.

In an action filed on March 3, 1939, against Herbert C. Legg, the Administrator of the Works Progress Administration for Southern California, the plaintiff, a stage director and writer, has challenged the validity of this enactment upon the ground 'that it is unconstitutional and that, through its enforcement, he and other noncitizens would be deprived of liberty and property without due process of law, in violation of the Fifth Amendment to the Constitution of the United States, U.S.C.A.

The factual bases for the attack as stated in the complaint are these. Plaintiff entered the United States lawfully as an immigrant on October 5, 1934, at the port of New York. Shortly thereafter he moved to Los Angeles, California, where he has resided since. In November, 1934, he filed a declaration of intention to become a citizen of the United States. He is by profession a stage director, and has a mother sixty-five years old depending upon him for

support. From November, 1934, he worked at his profession and supported himself adequately, never being a charge upon the community. On February, 1938, owing to the general economic distress, he applied for work at the Works Progress Administration in Los Angeles, where he has since been regularly employed in the research department, to the entire satisfaction of his superiors. At the time of the filing of the complaint, the Administrator had expressed his intention to dismiss the plaintiff and all other non-citizens, and to discontinue their employment solely in obedience to the mandate of the joint resolution. Since that time that intention has been carried into effect and the plaintiff and other non-citizens have been dismissed.

Plaintiff seeks to have the resolution declared void and unconstitutional, its enforcement enjoined and mandatory relief ordering the defendant to re-instate him. He also asks for a mandatory injunction pending the hearing of the matter and that a three-judge statutory court be convened for the purpose of such hearing. The defendant has moved to dismiss upon the ground that the complaint fails to state a claim against him. Rule 12, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

Section 380a, Title 28 U.S.C.A., enacted in 1937, relates to the convening of three-judge courts when it is sought to enjoin the enforcement of an act of the Congress upon ground of unconstitutionality is not mandatory.

The section is patterned after Section 380, Title 28 U.S.C.A., enacted in 1911, and relating to the convening of a three-judge court when the enforcement of a state statute upon the ground of unconstitutionality is sought to be stayed. Ever since its enactment the courts have held that the judge to whom the request for a three-judge court is addressed need not grant it unless a substantial claim of unconstitutionality is presented in the complaint. See Ex parte Buder, 1926, 271 U.S. 461, 46 S.Ct. 557, 70 L.Ed. 1036; Stratton v. St. Louis S. W. R., 1930, 282 U.S. 10, 15, 51 S.Ct. 8, 75 L.Ed. 135; Ex parte Poresky, 1933, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152; Wylie v. State Board of Equalization, D. C., 1937, 21 F.Supp. 604. The Supreme Court has given a similar interpretation to the new enactment. California Water Service Co. v. City of Redding, 1938, 304 U.S. 252, 58 S.Ct. 865, 82 L.Ed. 1323. We

must, therefore, determine whether the complaint here raises a substantial constitutional question which has not been definitely decided by the Supreme Court. ·

Despite the liberal attitude which the United States has taken towards immigration, there has been, throughout its history, strong opposition to aliens. Jefferson voiced his objection when he wrote in his Notes on Virginia (1782): "They (immigrants) will infuse into it (legislation) their spirit, warp and bias its directions and render it a heterogenous, incoherent, distracted mass."

The unlimited immigration policy which obtained during the first century of our national life was replaced at the end of the World War by the restrictive immigration policy now in force.

The alien in our midst who is legally in the United States is protected against arbitrary discrimination by the guarantees of the Fifth and Fourteenth Amendments to the Federal Constitution, U.S.C.A. of the Fourteenth Amendment the Supreme Court in Yick Wo v. Hopkins, 1886, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220, said: "The fourteenth amendment to the constitution is not confined to the protection of citizens. It says: 'Nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; *and the equal protection of the laws is a pledge of the protection of equal laws.*" (Italics added.) But this protection does not estop a governmental body from preferring citizens in the matter of employment. Laws of this character have been enacted in many states. California has had such preferences on its statute books since 1915. California Labor Code, St.1937, pp. 246, 247, Secs. 1850–1854, 1940–1944.

One may gather from a study of the problem that the disappearance of the frontier, the industrialization of the United States, the increase in the urban population and the limited opportunities for employment led to the establishment of preference. When challenged, these statutes have been upheld upon the theory that the furnishing of employment, through public agencies, is the exercise of the power of sovereignty to spend its money and property as it chooses. The scope of public works has broadened materially in late years. Governmental bodies have sought to pick up some of the slack in private employment through extensive public works programs. And one can readily see why, with a limited opportunity for work, legislative bodies should declare a policy of preference. Of course, any attempt to enforce such a policy *on private employment is condemned as* infringing the alien's right to earn his livelihood, which "is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure." Truax v. Raich, 1915, 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131, L.R.A. 1916D, 545, Ann.Cas.1917B, 283. But acts of legislatures forbidding employment of non-citizens on public work whether done by the public body itself or by a contractor, are not considered to infringe upon an alien's right to employment.

In a system like ours, where public employment is the exception rather than the rule, the expenditure of moneys for public work, whether in days of normal or abnormal unemployment, is in the nature of a bounty, *through employment.* Los Angeles v. Industrial Accident Commission, 1937, 9 Cal.2d 705, 72 P.2d 540. And as said by Mr. Justice Cardozo in People v. Crane, 1915, 214 N.Y. 154, 108 N.E. 427, 430, L.R.A.1916D, 550, Ann.Cas.1915B, 1254:

"The state, in determining what use shall be made of its own moneys, may legitimately consult the welfare of its own citizens, rather than that of aliens. Whatever is a privilege, rather than a right, may be made dependent upon citizenship. In its war against poverty, the state is not required to dedicate its own resources to citizens and aliens alike. 'The relief of the poor—the care of those who are unable to care for themselves—is among the unquestioned objects of public duty.' Brewer, J., in State v. Osawkee Tp., 14 Kan. 418, 421, 19 Am. Rep. 99. The modern state everywhere is mindful of that duty. It has extended its bounty in large measure, though not without some discrimination, to aliens; but it would not trench upon their rights under the Constitution if it were to confine its bounty to its citizens. As it may discriminate between citizens and aliens in relief, so also it may discriminate in employment. When payment for public works is to be made from public funds, it may prefer in employment its own citizens, since to them the Legislature may believe that the first

duty is owing. United States v. Realty Co. 163 U.S. 427, 440, 16 S.Ct. 1120, 41 L.Ed. 215. Everywhere throughout the world the state, in its relation to the laborer, is assuming a larger obligation; but it cannot be that it owes this obligation to citizens and aliens in equal measure."

The same thought underlies all decisions of the Supreme Court dealing with the subject. Atkin v. Kansas, 1903, 191 U.S. 207, 24 S.Ct. 124, 48 L.Ed. 148; Heim v. McCall, 1915, 239 U.S. 175, 36 S.Ct. 78, 60 L.Ed. 206; Crane v. New York, 1915, 239 U.S. 195, 36 S.Ct. 85, 60 L.Ed. 218. In Lubetich v. Pollock, D.C., 1925, 6 F.2d 237, 240, a three-judge court, speaking through Webster, District Judge, said:

"In the matter of developing their public works, municipalities are dealing with their own property, and in consequence may prescribe such conditions as they see fit. 'The principle that justifies these discriminations is that the common property of the state belongs to the people of the state, and hence that, in any distribution of that property, the citizen may be preferred.' People v. Crane, 214 N.Y. 154, 108 N.E. 427 [L.R.A.1916D, 550, Ann.Cas.1915B, 1254]. See, also, Atkin v. Kansas, 191 U.S. 207, 24 S.Ct. 124, 48 L.Ed. 148.

"Obviously it is a denial of the equal protection of the laws when a lawmaking body, regulating, not its own property, but private business, undertakes to deny to aliens the right to engage in lawful trade or labor; but it is difficult to comprehend how there can be any such violation when the Government, in its capacity of owner and proprietor of property, refuses to allow an alien the right to share therein on equal terms with those for whom the property involved is held in sovereign trust. In such circumstances aliens are denied participation in the property, for the simple reason that they do not own it, either in whole or in part, and in consequence have no right to share its enjoyment."

See 2 Am.Jurisprudence, Aliens, # 17.

■ The guarantee of due process in the Fifth Amendment is not broader than the similar guarantee against state discrimination in the Fourteenth. United States v. Armstrong, D.C., 1920, 265 F. 683, 691. While some of the cases involving preferences in public employment by state agencies speak of the police power of the state, the regulations are, ultimately, upheld upon the ground that the state agencies have the right to determine to whom they will distribute their property and that an alien has no inherent right to be employed on public work. The Public Works Program of the United States is carried on chiefly through the exercise of the general welfare clause in the Constitution of the United States (Article 1, § 8, cl. 1). While this clause is not, perhaps, so broad as the police power of the states, the tendency has been to enlarge the frontier of "general welfare." United States v. Butler, 1935, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914. If a state, in creating public work either as a means of alleviating poverty or relieving unemployment may give preference to citizens, it is difficult to see why the federal government may not do so. It may be true, as stated at the argument, that, with a scarcity of employment, public works by the United States Government assume a greater scope. It may also be conceded that in many instances preferences of this character make the lot of the alien hard.

But there is plausibility in the answer that if such hardship should result, it is of the alien's own choosing. When granted the right to enter the United States, he is not guaranteed employment. In fact, since 1885, the statutes of the United States prohibit and punish the importation of contract laborers. 8 U.S.C.A. §§ 139–143. Once legally in the United States, and so long as he does not violate its laws, the alien is accorded the same protection against arbitrary power as the citizen. If he is denied the privilege of sharing the bounty of the government through employment on public works, the fault lies at his own door.

■ The United States, during all of its existence as a nation, has been very liberal in its naturalization policy. If an alien has not been here a sufficient length of time to acquire citizenship, he cannot very well complain because every sovereignty demands a certain probationary residential period as a condition of naturalization. If an alien, although domiciled within the country for a sufficient length of time to become a citizen, chooses not to do so, he should not be heard to complain. The governmental body charged with discrimination by the alien can give Molière's classic answer: "Tu l'as voulu, Georges Dandin." In saying this I am not unmindful of the fact there is a good deal of xenophobia which has expressed itself at various times

in restrictions which do not impress one as having any direct relation to public welfare, such as denial of the right to fish (Alsos v. Kendall, 1924, 111 Or. 359, 227 P. 286; Lúbetich v. Pollock, D.C., 1925, 6 F. 2d 237) or to bear arms (Ex parte Rameriz, 1924, 193 Cal. 633, 226 P. 914, 34 A. L.R. 51). It is indubitable also that in time of economic distress, distrust of the alien asserts itself more strongly and there is an inclination to blame him for ills for which he is not responsible. And a governmental body, state or federal, in denying, to the alien, privileges it grants to the citizen, may be encouraging hatred rather than amity between the citizen and non-citizen and make itself the vehicle of prejudice. Compare the Biblical injunction, Deuteronomy 1, 16–17. But, objectionable though such practices be from the standpoint of sound governmental policy, if they express themselves in constitutional form, we cannot deny them validity when attacked.

Enactments like the one under attack have been so definitely and uniformly declared not to violate any constitutional guarantee that it cannot be said that the question raised here is of sufficient substance to warrant invoking the extraordinary procedure provided in Section 380a. See, Oklahoma Gas and Electric Co. v. Oklahoma Packing Co., 1934, 292 U.S. 386, 391, 54 S.Ct. 732, 78 L.Ed. 1318.

The motion to convene a three-judge court will be denied and the motion to dismiss will be granted.