Hillsborough, }
Feb. 9, 1922. }

## STATE *v.* ANDRÉ RHEAUME.

Laws 1917, *c.* 185, *s.* 6, forbidding aliens to have firearms in their possession without a permit is not unconstitutional as an unequal law under the fourteenth amendment.

Under P. S., *c.* 278, *s.* 7, to constitute manslaughter in the first degree "by a person bearing any deadly weapon" it is not sufficient that the killing results merely from the use of the dangerous weapon but such person must be a conscious agent in discharging it, — the unlawful act must be the legal cause and not simply the occasion of the homicide.

An objection to a juror on the ground of preconceived opinion is a challenge to the favor; whether he is indifferent is a question of fact for the trial court, whose finding is unexceptionable when based on any competent evidence.

An objection to hearsay is waived, if the objecting party introduces evidence establishing the same fact.

The order in which evidence should be received at the trial lies in the discretion of the trial justice.

Though exceptions to a charge are ordinarily waived unless taken and reduced to writing before the jury retires, the constitutionality of a statute authorizing punishment for crime may be questioned at any stage of the proceedings.

Upon trial of an indictment for murder, evidence of the unlawful possession of a gun (Laws 1917, *c.* 185) may be material upon the question of an intent to intimidate others, irrespective of the issue as to the degree of the crime.

INDICTMENT FOR MURDER. Trial by jury and verdict of guilty of manslaughter in the first degree. At the January term, 1921, of the superior court a bill of exceptions was allowed by *Branch*, J., upon respondent's exceptions to the exclusion of a juror, the admission and exclusion of evidence, the charge to the jury, and to a ruling sustaining the constitutionality of *ss.* 6, 7, *c.* 185, Laws of 1917. The facts are stated in the opinion.

*Oscar L. Young*, attorney-general, *George I. Haselton*, solicitor, and *Jennie Blanche Newhall* (*Mr. Young* orally), for the state.

*Percy A. Guthrie* (of Massachusetts) and *Cyprien J. Belanger* (*Mr. Guthrie* orally), for the respondent.

SNOW, J. Upon the *voir dire* a juror testified that upon information obtained from reading newspapers he had formed an opinion upon the issue whether the shooting was reasonable or justifiable; that this opinion still obtained in his mind so that it would require very strong evidence to overcome it; that he had no prejudice; that as

a juror he would be guided by the law and evidence. The respondent excepted to the order of the court excusing the juror.

In this state an objection to a juror on the ground of preconceived opinion is a challenge to the favor. Whether he is indifferent is a question of fact for the trial court. *State* v. *Pike,* 49 N. H. 399, 406, 407; *State* v. *Jones,* 50 N. H. 369, 381; *State* v. *Sawtelle,* 66 N. H. 488, 528; *State* v. *Perkins,* 70 N. H. 330, 331; *State* v. *Comery,* 78 N. H. 6, 12. Respondent's exception can, then, be sustained only if the exclusion was manifestly against law and evidence. *State* v. *Pike, supra; State* v. *Sawtelle, supra; State* v. *Comery, supra.* It cannot be said as a matter of law that a juror who entertained an opinion upon the merits of the case which could be overcome only by "very strong evidence" was "as impartial as the lot of humanity will admit." (Const., Part I, *arts.* 21, 35.) In the light of the manner and appearance of the witness, his admission may well have outweighed his professions of impartiality and want of prejudice. *March* v. *Railroad,* 19 N. H. 372, 375, 376; *State* v. *Sawtelle, supra,* 528. To justify his exclusion it was not necessary that his answers should demonstrate beyond doubt a mental state of partiality. *State* v. *Comery, supra,* 12.

The evidence introduced by the state tended to show that on the night of the homicide the respondent, wearing an army overcoat, attended a dance given by the American Legion in the state armory on Pleasant street in Manchester; that during the evening he was put out of the armory on account of his intoxicated condition by police officer Scannell, who was detailed for duty at the armory. Later in the evening he was seen loitering around the place with a revolver in his possession, and threatening to "get" the police officer. One Manning heard the threats and knew respondent had a gun, and went into the armory and informed the officer that respondent had threatened to "get" him; then he came out and with deceased started in pursuit of respondent, who after firing a shot, ran away. They found respondent hiding on the steps back of the city hall. As they started towards him, he started in their direction with the revolver in his hand, and fired another shot. Proulx and Manning then grappled with him, and a third shot was fired resulting in the death of Proulx. Respondent was carrying the revolver in violation of law.

Officer Scannell, a state witness, was permitted to testify upon re-direct examination that after the respondent left the armory, Manning told him that the respondent "had a gun" and was "going to get" the witness. This was objected to as hearsay.

The evidence appears to have been offered by the state's counsel upon the theory that the officer's knowledge of the facts was material, for which purpose it would have been competent. Whether or not his knowledge was material is not disclosed by the evidence or facts reported. If immaterial, the objectionable statement would at most seem to constitute harmless error, since Manning had already testified without objection that he reported to the officer that respondent had threatened to "get him." Scannell's testimony that he heard what Manning said added nothing prejudicial to respondent. The respondent subsequently testified upon direct examination in great detail as to his possession and handling of the gun. An objection to hearsay is waived if the objecting party introduces evidence establishing the same fact. *Fuller* v. *Railroad,* 78 N. H. 366, 370; *Rowell* v. *Railroad,* 58 N. H. 514, 515; *Foye* v. *Leighton,* 24 N. H. 29, 37, 38; *Wiggin* v. *Damrell,* 4 N. H. 69, 74. The testimony of the witness objected to was admitted by the court on the ground that respondent's counsel had cross-examined the officer at considerable length as to why he did certain things which in the opinion of the court rendered what he heard and saw competent. Without a transcript of the previous testimony of the officer, it cannot be presumed that this ruling of the court was error.

Counsel for respondent in cross-examination asked a state's witness, "Do you know that Manning has a police record?" Subject to respondent's exception, the question was excluded upon the ground that it was not a proper time to go into the matter, as Manning had not then testified. The order in which evidence should be received at a trial lies in the sound discretion of the trial justice. *Kent* v. *Tyson,* 20 N. H. 121, 124, 125; *Soucier* v. *Company,* 77 N. H. 118. See *Holman* v. *Manning,* 65 N. H. 228, 229. No error in the exercise of this discretion appears.

Sections 6 and 7, c. 185, Laws 1917 declare that it shall be unlawful for a person not a citizen of the United States, and who has not declared his intention of becoming a citizen, to have firearms in his possession. Under this statute the respondent was unlawfully in possession of the gun which produced the death of Proulx. The respondent excepted to such parts of the charge as treated such unlawful possession as competent evidence in fixing the degree of manslaughter under P. S., c. 278, s. 7, on the ground that c. 185, Laws 1917 is unconstitutional in that it discriminates against a resident non-citizen contrary to the letter and spirit of the constitution of the United States. This exception, with others, was not filed for

some months after the trial. All exceptions to the charge are usually waived unless taken and reduced to writing before the jury retires. Rule 52; *Moore* v. *Ross,* 11 N. H. 547, 557; *State* v. *Rye,* 35 N. H. 368, 381; *Jackson* v. *Barron,* 37 N. H. 494, 497; *Boyce* v. *Railroad,* 43 N. H. 627, 628; *State* v. *Gorham,* 55 N. H. 152, 169; *First National Bank* v. *Ferguson,* 58 N. H. 403, 404; *Dow* v. *Merrill,* 65 N. H. 107, 110, 111; *Pitman* v. *Mauran,* 69 N. H. 230, 231; *Nadeau* v. *Sawyer,* 73 N. H. 70, 72; *Moynihan* v. *Brennan,* 77 N. H. 273, 274; *Hill* v. *Carr,* 78 N. H. 458, 462; *Alden Speares Sons Company* v. *Railroad, ante,* 243. But the constitutionality of a statute authorizing a prosecution involving the punishment for crime may be questioned at any stage of the proceedings. *Commonwealth* v. *Hana,* 195 Mass. 262. The respondent's exceptions of this character will therefore be considered.

The protection afforded by the fourteenth amendment of the federal constitution, forbidding any state to "deprive any person of life, liberty, or property, without due process of law" or to "deny to any person within its jurisdiction the equal protection of the laws" extends to all persons within the territorial jurisdiction, without regard to any difference of race, of color, or of nationality, "and the equal protection of the laws is a pledge of the protection of equal laws." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369; *Commonwealth* v. *Hana, supra; Pearson* v. *Portland,* 69 Me. 278, 281.

But this clause was not designed to interfere with the exercise of the police power of the states for the protection of the lives, liberty, and property of its citizens or for the promotion of the public safety, peace and order. *State* v. *Stevens,* 78 N. H. 268, 272, 273; *Giozza* v. *Tiernan,* 148 U. S. 657, 662; *Barbier* v. *Connolly,* 113 U. S. 27, 31; *In re Kemmler,* 136 U. S. 436, 449; *Mugler* v. *Kansas,* 123 U. S. 623, 662–665.

The fourteenth amendment did not abridge the right of protection inherent in the states and reserved when the constitution was adopted. *State* v. *Stevens, supra; Commonwealth* v. *Hana, supra; Trageser* v. *Gray,* 73 Md. 250. In the last named case it is said: "Public morals, public health, public order, peace and tranquillity are objects of cardinal importance to the well-being of society." In *Mugler* v. *Kansas, supra,* it was said: "It cannot be supposed that the States intended, by adopting that Amendment, to impose restraints upon the exercise of their powers for the protection of the safety, health, or morals of the community."

For these purposes the legislatures have a wide field of discretion

in classification of subjects of legislation. *Lindsley* v. *Company*, 220 U. S. 61, 78, 79. A statute is not objectionable as class legislation because it affects only the members of one class, if the classification involved in the law is founded upon a reasonable basis. *Ib.; State* v. *Phillips*, 107 Me. 249.

Every presumption will be entertained in favor of the reasonableness of the basis of classification adopted by a state under its police power against an attack based upon the equal protection clause of the fourteenth amendment. *Crescent Cotton Oil Co.* v. *Mississippi*, (U. S.) 66 L. Ed. 55, 58; *Lindsley* v. *Company, supra; Rast* v. *Company*, 240 U. S. 342; *Keokee Consolidated &c. Co.* v. *Taylor*, 234 U. S. 224, 227; *Middleton* v. *Company*, 249 U. S. 152.

"If the calling is one that the state, in the exercise of its police power, may prohibit either absolutely, or conditionally by the exaction of a license, the fact of alienage may justify a denial of the privilege. . . . There must, however, be some relation in such cases between the exclusion of the alien and the protection of the public welfare." *People* v. *Crane*, 214 N. Y. 154, 169; affirmed, 239 U. S. 195, 198.

Classifications distinguishing between citizens and aliens have, not infrequently, been the basis of regulations under the police powers of the states. A statute regulating the sale of intoxicating liquor which provides that a license to sell at retail shall be granted only to citizens of the United States of temperate habits and good moral character was upheld as a valid exercise of the police power of the state and not in conflict with the fourteenth amendment. The basis of the distinction is stated to be that the privilege of selling intoxicating liquors is very liable to be abused and citizens might reasonably be supposed to have a superior regard for the public welfare. *Trageser* v. *Gray*, 73 Md. 250. So a statute denying licenses to pedlers unless they are citizens of the United States does not violate the fourteenth amendment. The reason is found in the character of the business which furnishes such opportunities for the practice of fraud and in the difficulty of providing remedies. *Commonwealth* v. *Hana*, *supra; Trageser* v. *Gray, supra*. Statutes requiring an applicant for a pilot's license to be an American citizen and a legal voter (*State* v. *Ames*, 47 Wash. 328), or restricting the vending of lightning rods to sales by agents resident in the state (*State* v. *Stevens, supra*) are for justifiable reasons not in conflict with the fourteenth amendment.

A requirement that the fact of residence of Chinese shall be proved by more than one white witness is justified, because it had been found

that the enforcement of similar laws was attended with great embarrassment, from the suspicious nature, in many instances, of the testimony offered to establish the residence of the parties, arising from the loose notions entertained by the witnesses of the obligation of an oath. *Li Sing* v. *United States*, 180 U. S. 486, 494, 495. Equal protection of the laws under the fourteenth amendment is not denied by a statute prohibiting the killing of any wild bird or animal by any unnaturalized foreign born resident except in defense of person or property and to that end making it unlawful for such foreigner to own or be possessed of a shotgun or rifle and imposing a penalty of a fine of $25 and a forfeiture of the gun. *Patsone* v. *Pennsylvania*, 232 U. S. 138, 143, 144.

Aliens are under no special constitutional protection which forbids a classification otherwise justified simply because the limitation of the class falls along the lines of nationality. That would be requiring a higher degree of protection for aliens as a class than for similar classes of American citizens. The citizens of the American states are constantly subjected to the operation of reasonable statutory regulations under the police power of other states. *State* v. *Stevens, supra.* It therefore remains to be considered whether there is such a relation between the restriction as to the alien and the public safety as to warrant the classification in the present case.

Laws 1917, *c.* 185, provides as follows: "Sect. 6. No person not a citizen of the United States or one who has legally declared his intention of becoming such a citizen shall have in his possession any firearm or firearms of whatsoever kind or description unless he has a written permit to have such possession issued and signed as hereinafter provided. Any such person desiring to possess a firearm or firearms for any lawful purpose shall first make written application to the chief of police or selectmen of the town wherein he resides, or to the county commissioners if he resides within the state but outside the limits of any organized city or town, stating the purposes for which the possession of the firearm or firearms is desired and a description of the firearm or firearms. The applicant shall also state his full name, occupation, place of residence, and if in a city the street and number. If such chief of police or selectmen or county commissioners are satisfied that the applicant intends to use the firearm or firearms in a lawful manner and as set forth in his application, a permit shall be issued, signed by the chief of police of the city, or selectmen of the town, or county commissioners, as the case may be, giving to the applicant the right to have in his possession such

firearm or firearms.   The holder of any such permit shall keep the permit on his person at all times when he has possession of the firearm or firearms as authority for such possession and shall exhibit the same when so requested by any person."   "Sect. 7.   Any person not a citizen of the United States or one who has legally declared his intention of becoming such a citizen, who shall procure or have in his possession any firearm or firearms of any kind without having first obtained a permit as provided in section 6, or after such permit has been revoked, as hereinafter provided, shall be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both."

This statute is entitled "An Act For The Regulation Of The Sale And Use Of Explosives And Firearms."   Sections 1 to 5 inclusive forbid the manufacture or sale of firearms or explosives by any person who has not first obtained a written license specifying the building where the business is to be carried on; forbid such dealer to sell firearms to any person not a citizen of the United States (unless he shall have declared his intention of becoming such a citizen), or any explosive to any person without a permit or unless satisfied that it is to be used for a lawful purpose; require every such dealer to keep a record in much detail of all sales to whomsoever made; forbid the transportation, use, or possession of explosives by anyone without a written permit issued only upon an application containing much detailed information; and for a violation of any of these provisions affix the same penalty as provided in section 7.

The discrimination relied upon by respondent is the distinction made in this statute between the citizen and the non-citizen, in the prohibition, under penalty, of the possession by the latter of firearms and explosives without a written permit.   Is there a real and substantial basis for the distinction?

That explosives and firearms are proper subjects of regulation is self evident.   The legislature was dealing with subject-matters of great inherent danger to the public.   That the carrying of loaded firearms is a practice fraught with peril to peaceful citizens of the community is evidenced by numerous fatalities.   The opportunity and temptation for their use by a person in sudden passion or under the influence of intoxication, or both, justifies restraining and regulating statutes.

The law did not have its birth in hostility to any race.   (*Yick Wo* v. *Hopkins, supra.*)   On the other hand, it discloses a justifiable solicitude for the public safety.   The evident intent of the legislature

was to promote the public welfare by establishing a system, by which a record should be kept, open to the inspection of the public authorities, of the location of dangerous explosives and firearms, and to limit their possession in irresponsible hands. It was an incident to such a system that a classification should be made, based on domicile, allegiance, duty, habit, temperament, and other characteristics which distinguish the citizen and applicant for citizenship from the alien who has manifested no desire or intention to bind himself to support the government.

Citizens as a class have more settled domiciles, and are better known to the local police officials, while the sojourn of aliens in this country in theory, and usually in practice, is temporary, and their abode, while here, capricious and uncertain. Citizens, by means of taxation, bear the expense of the government and of police protection, while the alien does not necessarily pay taxes or share any part of the public burden. Native citizens are justly presumed to be imbued with a natural allegiance to their government which unnaturalized foreigners do not possess. The former inherit a knowledge and reverence for our institutions, while the latter as a class do not understand our customs or laws, or enter into the spirit of our social organization. Or, passing more directly to the use of firearms, the citizen has an obligation to defend the state, while the alien has none. The citizen is required to assist in maintenance of order, the enforcement of law, and the arrest of wrongdoers in some instances. It is clear that there exists a reasonable and substantial basis for the classification. It seems reasonable to class with native citizens persons who have been naturalized or who have legally declared their intention to become citizens, since, under the naturalization laws, they have declared or indicated their purpose to declare their allegiance to our constitution, have submitted evidence of their attachment to our institutions, have adopted a place of residence and have assumed or contemplate the full assumption of the duties of citizenship. *Commonwealth* v. *Hana, supra; Trageser* v. *Gray, supra.*

The respondent contends that the act of possessing a gun in violation of *c.* 185, Laws of 1917, is not such an unlawful act as was contemplated by the legislature by the use of the word offense in fixing the degree of manslaughter in P. S., *c.* 278, *s.* 7. Manslaughter as used in this statute is any unlawful killing of a human being which is not murder. If it is found that the killing in the case at bar was unlawful and did not constitute murder, the question of the degree of manslaughter arises. The statute divides manslaughter into two

degrees by the provisions of *ss.* 7, 8, which are as follows: *s.* 7, "Manslaughter, not being murder, nor excusable nor justifiable homicide, is of the first degree [1] when perpetrated with a design to effect death, or when perpetrated without such design [2] by a person engaged in the commission of any offense, or [3] by two or more persons, or [4] by a person bearing any deadly weapon, either open or concealed, or when perpetrated [5] in a cruel or unusual manner, or [6] by means of any deadly or dangerous instrument;" *s.* 8 "Every killing of one human being by the [7] act, [8] procurement, or [9] culpable negligence of another, which is not murder, nor excusable nor justifiable homicide, nor manslaughter of the first degree, is manslaughter of the second degree." Of these provisions the only ones material to manslaughter in the first degree, when there was no design to effect death, so far as concerns the present case, are those which cover homicide when perpetrated [2] by a person engaged in the commission of any offense [4] by a person bearing any deadly weapon [6] by means of any deadly or dangerous instrument.

It is beyond dispute that the killing in the case at bar was caused by a deadly weapon and a dangerous instrument. While the statute as above indicated provides three distinct grounds upon which a finding of this grade of manslaughter might be predicated and one or more of the three might be relied upon, it would seem that under the facts in this case the last two named [4] and [6] are inclusive of the first [2] and that the state might well rest its case, so far as undesigned manslaughter of the first degree is concerned, upon the allegations, either one or both, that the homicide was perpetrated by the respondent [4] bearing a deadly weapon or [6] by means of a deadly or dangerous instrument without reference to whether he was [2] engaged in the commission of any offense. In fixing the degree of manslaughter it is therefore unnecessary to decide whether the unlawful carrying of a concealed weapon or the unlawful possession of such a weapon is the offense intended by clause [2] of the statute.

But evidence of the unlawful possession of the gun under *c.* 185, Laws 1917 was material upon the question of unlawful killing irrespective of the issue of fixing the degree of the crime. The respondent admitted that he knew it was unlawful for him to have the gun in his possession or to discharge it in a public place. Knowing that his conduct was unlawful, he presented himself at a place of public gathering well under the influence of voluntary intoxication, with a supply of liquor in one pocket and a loaded gun in another, — illegally

dispensing the one to whomsoever he chose and firing the other into the air when it suited his convenience to intimidate his pursuers. This was evidence of continuing lawlessness, extending from the time he left his room, where he armed himself, until he was apprehended. Disregarding for the moment his professions of good intent which a jury was not bound to accept, what actually happened, according to his own statement, might as well have been the logical sequence of an original purpose, by means of the unlawful possession of the gun, to assert his right to recognition wherever he went and to intimidate anyone who should presume to oppose him. By his own confession he twice unlawfully used the gun to intimidate his pursuers. It could be found that the third and fatal shot was a similar attempt to intimidate.

The respondent seasonably excepted to the charge to the jury as follows: "I wish to take exception to that part of the charge wherein the court said that Rheaume would be guilty of manslaughter in the first degree on account of the unlawful carrying of a gun without any reference to whether his carrying of the gun was the proximate cause of the death of Proulx." The state's counsel, in oral argument, concede that this exception sufficiently covers the questions raised by respondent so far as hereinafter discussed.

The respondent took the stand in his own behalf and denied making any threats at the armory. His testimony tended to show that, during the evening, he had drunk heavily of intoxicating liquor, a quantity of which he had upon his person and with which he had been treating others outside of the armory; that following his exclusion from the dance hall, quite a crowd gathered about him and that upon his refusal to treat, he was pushed into the street and threatened with an attack; that he fired his revolver to scare away his assailants and then ran away and hid behind the city hall where he was discovered and attacked by Manning and Proulx; that he fired another shot to bluff them and attempted to run away down the back street; that they hit him on the side of the head, piled on his back, one grabbing him by the back and one by the wrist; that he then got a second blow on the back of his head which rendered him unconscious; that he did not hear the fatal shot and that he first knew that Proulx had been shot the next day.

After reading and explaining P. S., c. 278, ss. 7, 8, and after calling attention to the statute forbidding the carrying of concealed weapons and to ss. 6, 7, c. 185 of Laws 1917, making it unlawful for aliens to possess firearms without permit, the court submitted the case to

the jury upon the instructions covered by respondent's exception which will be stated and discussed in the order given, viz:

1. "Now, it appears that Rheaume was not a citizen of the United States; that he has not declared his intention of becoming a citizen, and therefore he could not legally own a revolver. The other provision of the law which is important is one which forbids the carrying of concealed weapons. Both of these provisions may be of importance in this case. If Rheaume was carrying a concealed weapon or a weapon not concealed under the section of the statute which I have read and the killing resulted from the use of that dangerous weapon, then he is guilty of manslaughter in the first degree under the statute which I have read to you."

This instruction ignores the agency of Rheaume in the killing of the deceased. So far as the "commission of any offense" or the "bearing any deadly weapon," are necessary elements in fixing the crime of manslaughter as of the first degree, P. S., c. 278, s. 7 expressly requires that the crime shall be perpetrated "*by* a person engaged in the commission" of the offense, or "*by* a person bearing" the deadly weapon. While the evidence may have strongly sustained the position of the state that Rheaume in his struggle to escape arrest and to retain the possession of the gun, either designed to effect the death of his pursuers or consciously discharged the gun with indifference as to the result, it did not justify the instruction that he was guilty of manslaughter in the first degree under the statute simply because the killing resulted from the use of the dangerous weapon. Rheaume's admission that he had been unlawfully carrying, and a moment before unlawfully using, the gun is not conclusive evidence that the death of Proulx resulted from such unlawful carrying or use. If the gun was discharged by the act of Proulx or Manning in wresting it from the hands of Rheaume while he was bereft of his senses, with no prior plan or design to injure anyone, the homicide was not perpetrated *by* him. However blameworthy Rheaume was in creating the occasion for the fatal shot and however culpable his conduct prior to his loss of consciousness, if the jury believed Rheaume's story that he had no purpose or design except to escape and that he was not a conscious agent at the time the gun was discharged, the circumstances do not conclusively bring the homicide within the statutory· limitation of manslaughter in the first degree. In other words, in order to constitute manslaughter in the first degree, the unlawful act must be the legal cause, and not simply the occasion, of the homicide.

2. "Now, the respondent's version of what occurred is that he was the victim of an assault at the armory; that he fired a shot there to scare away his assailants, and sought to escape by running, that after he was discovered back of the city hall he again fired a shot to 'bluff' his assailants, to use his words, and that he then tried to get away from Proulx and Manning, who grabbed him and struck him twice, and that after that he has no memory of what occurred. If you find that what Rheaume says is true he can not be acquitted in this case. If you accept his testimony at its face value he is guilty of manslaughter in the first degree, because at the time he was unlawfully making use of a deadly weapon, and he makes no claim or statement that he fired in self-defense."

Here the court seems to have assumed that Rheaume had testified that he was making use of the gun when Proulx was killed, whereas Rheaume had testified that at that time he was unconscious. If he was telling the truth he was incapable of making use of the gun. For the purposes of the case he was then as inanimate as the gun itself. However unbelievable Rheaume's story, so long as reasonable men might differ upon the question, its truth or falsity was for the jury. By the assumption that Rheaume was "at the time . . . unlawfully making use of a deadly weapon" the court undertook to decide this question of fact. If, however, the court intended, by the language used, to instruct the jury that the law was satisfied by the admission of the prior unlawful possession or the bearing of the weapon by Rheaume followed by the killing through its instrumentality regardless of how such killing resulted, the charge is subject to the infirmity already noted of ignoring the fact of the conscious agency of Rheaume in the act resulting in the killing.

3. "To sum up the various situations which may arise . . . if you accept Rheaume's word, that he was attempting to get away from all pursuit, and that while so doing he unlawfully made use of a gun and as a result of his unlawful use of the gun Proulx's death resulted, then Rheaume is guilty of manslaughter in the first degree."

It is possible that there is an error in reporting this part of the charge by the omission of the words "if you find" following the words "pursuit, and," since Rheaume denied any knowledge of what occurred at the time of the fatal shot. But taking the language as reported, the only question left to the jury was whether they would "accept Rheaume's word," which the court proceeds to interpret. By such interpretation respondent is made to admit that Proulx's death resulted from such unlawful use. Rheaume had admitted that

he attempted to escape from all pursuit and, while doing so, that he was unlawfully possessed of a gun and also that he had unlawfully made use of the gun in trying to bluff his assailants, but there is nothing in his reported testimony which could be interpreted as an admission that Proulx's death resulted from such unlawful possession or use. On the contrary he disclaims any knowledge whatever of what happened after the time he received the second blow upon the head which preceded the fatal shot. Rheaume's admission of the prior unlawful possession and unlawful use of the gun, coupled with his denial of any knowledge of what subsequently happened, does not justify the interpretation that he admitted that the death of Proulx resulted from such unlawful acts. The state's counsel correctly state in their brief that "it was for the jury to say whether or not Rheaume's unlawful act resulted in the death of Proulx upon the evidence submitted." Instead, the jury were given to understand that this fact had been admitted by the respondent and that if they accepted his word, Rheaume was guilty of manslaughter in the first degree.

In view of the foregoing, it is unnecessary to consider the further exceptions of the respondent.

*Verdict set aside: new trial.*

All concurred.