28

[Crim. No. 2457.   Second Appellate District, Division One.—April 11, 1934.]

THE PEOPLE, Respondent, v. FRANK CANNIZZARO, Appellant.

Cantillon & Medigovich for Appellant.

U. S. Webb, Attorney-General, and Bayard Rhone, Deputy Attorney-General, for Respondent.

DESMOND, J., *pro tem.*—The defendant appeals from judgments of conviction on two counts; the first charging him with violating chapter 339, Statutes of 1923, by possessing on or about April 26, 1933, "an instrument and weapon commonly known as a black-jack and billy"; the second charging a violation of the same law, as amended in 1931, Act 1970, section 2 (Deering's Gen. Laws), and alleging that, on or about the date mentioned, defendant was not a citizen of the United States, and that at that time he had "in his possession and custody, and under his control, a certain firearm, to-wit, a revolver, . . . the said firearm having a barrel less than twelve inches in length". The act defines such a weapon as one "capable of being concealed upon the person" and the information so described it. This appeal is also grounded upon an order of the trial court denying defendant's motion for a new trial on both counts.

An unmarried woman, who testified that she was engaged to the defendant and that she had assumed the name of Pauline Durant, by which she will be known in this narrative, resided for some months prior to April 26, 1933, in apartment 407 of a certain apartment house in the city of Los Angeles. The defendant was seen passing through the lobby of this building on various occasions by the landlady, to whom Pauline Durant paid rent for apartment 407. On one occasion Mrs. Durant introduced the defendant, as Frank Hugo, to the landlady. About noon of April 26, 1933, three police officers called at apartment 407, defendant coming there about ten minutes later after Mrs. Durant had telephoned him. While awaiting defendant's arrival, the officers —according to one of them, Walter Schubert—searched the apartment and found there "a sap, a three-cell flashlight with a red lens; some buckshot, some revolver cartridges, some bird shot". This officer also testified that shortly after entering the apartment, defendant picked up a revolver from under a cushion on an overstuffed set in the living-room, and handed it to him. This weapon Schubert described as a blue steel, Smith & Wesson, hammerless revolver with a barrel about 2½ or 3 inches long. The "sap" or "billy" referred

to in this officer's testimony was then introduced in evidence, also the flashlight. At this point the district attorney undertook to elicit from the police officer a conversation which he claimed to have had with defendant in apartment 407 at the time the articles above named were found by the officers or produced by defendant. Counsel for defendant interposed an objection on the ground that the *corpus delicti* had not been proved; that therefore admissions or confessions by the defendant could not legally be introduced to supply the missing essentials of such proof. The trial court ruled that there had been sufficient proof of the *corpus delicti* to permit the conversation to be related. This ruling is assigned as error. We must therefore analyze the offenses charged. As to the first count, there are two elements of the *corpus delicti:* First, possession; second, a weapon prohibited by the statute. As to the second count, there are three elements: Possession, a proscribed weapon and alienage of the defendant. In connection with this last element, we know that in addition to the testimony above narrated, the defendant was charged under the name Cannizzaro, and was present before the jury.

*People* v. *Selby*, 198 Cal. 426, at page 438 [245 Pac. 426], lays down the rule "that the *corpus delicti* is not required to be established to a moral certainty and beyond a reasonable doubt before the extrajudicial statements, admissions, or confessions of a defendant may be received in evidence—*prima facie* proof of the *corpus delicti* being sufficient for that purpose". Gauged by this standard, which has been approved repeatedly, and considering especially the testimony which was before the jury that defendant produced the revolver from its place of concealment, we feel no error was committed by the trial court in admitting testimony of the conversations.  ▮  This brings us to appellant's contention that the evidence produced was insufficient to support the verdict on either of said counts. Having read the transcript, we find that in this case, as in many others, the jury had before it, when the evidence was all in, two contrary theories: one developed and disclosed by the People and its witnesses; the other by defendant's witnesses. This conflict of evidence was resolved against the defendant by the jury, and we cannot say, after a review of all the testimony produced by the People and apparently accepted as true by the jurors, that

there was anything so inherently improbable in it as to call for a reversal of either judgment.

Other assignments of error which are before us relate to misconduct charged to the prosecuting attorney by appellant, as follows: asking Mrs. Durant if it were not a fact that the officers when they took the defendant from the apartment house "told Frank Hugo they wanted him in connection with a murder"; alluding to defendant in argument to the jury as "Frank Hugo or Frank Cannizzaro or Paul Durant, or whatever his name may be"; referring to the apartment as a convenient place for bootleggers to take orders; describing the flashlight with a red lens as "an article used by 'thugs' and 'gangsters' and 'hoodlums' . . . a light conveniently used by high jackers and hoodlums for the purpose of simulating police officers"; various other similar remarks, expressing the belief that the possession of such tools by the defendant (who, according to the police officer, stated that he lived in apartment 407 and owned them all), stamped him in his trade and profession "as truly as anything that could be placed in this court, and having thus stamped him as they do, you can go into your jury room, if you want to, and turn loose upon Los Angeles one of the greatest racketeers, hoodlums and gangsters, we have ever had in our midst".

As to the first item above; an objection to the question as to whether the officers told Frank Hugo they wanted him in connection with a murder charge was sustained, although defendant's counsel had opened up this avenue of inquiry on direct examination by asking Mrs. Durant these questions: "Q. Was the conversation that took place between the officers and the defendant in your presence after he arrived? A. Yes. Q. State what that was?" Upon the court's sustaining the objection no answer was made to the inquiry. "Assuming it to have been an improper question a mere mistake by the prosecuting officer relative to a rule of evidence cannot be regarded as misconduct." (*People* v. *De Vries,* 69 Cal. App. 201, 206 [230 Pac. 982].) It may be noted also that no request was made by defendant's counsel to instruct the jury to disregard this conduct deemed objectionable on the part of the prosecutor as required under the rule of *People* v. *Carson,* 49 Cal. App. 12, 17 [192 Pac. 318]. As to the other items of claimed misconduct

occurring in the prosecuting attorney's argument to the jury certain comments by the court in *People* v. *Sieber*, 201 Cal. 341, 355 [257 Pac. 64, 70], are apropos. "Appellant complains of what he terms the 'shocking conduct and shameful tactics' of the deputy district attorney who conducted the case for the People in the trial court. The prosecuting officer may have been overzealous at times, but we are not persuaded that he was so unmindful of the duty he owed both to the state and to the defendant as to use his office 'as an engine of persecution', as charged by the appellant. We are unable to say that questions charged to have been asked by the deputy district attorney in bad faith were, in fact, improperly propounded. Neither are we convinced that during his argument to the jury that officer purposely referred to matters not in the record, or intentionally made misstatements of law, for the purpose of misleading the jury. The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury. (8 Cal. Jur., p. 263.)" We may say in passing, and in disposing adversely of these assignments of error, based on claimed misconduct, that the court admonished the jury that the arguments of counsel were not to be considered evidence in the case.

■ Appellant contends that error arose from the admission in evidence of an index card for another apartment, 410, in the same building as apartment 407. Inasmuch as the card bore entries in the hand of the landlady showing payments of rent made to her shortly after April of 1933, although the card was made out in the names of Mr. and Mrs. Frank Hugo by some other person, and since such card was part of the business records of the apartment house we do not feel that the trial court erred in ruling that it might go before the jury as having some evidentiary value, especially in view of other testimony that was introduced in regard to occupancy of that apartment by Mrs. Durant, installation of two telephones there, registration of the same as nonlisted numbers and other incidental matters. ■ As to an assignment of error predicated upon the admission

in evidence of the flashlight with a red lens, we hold that it is not well grounded, for the jury, in determining who occupied apartment 407, had a right to consider what was found there, and particularly this flashlight, which defendant, according to officer Schubert, said he owned, having received it from a milkman.

The remaining assignments of error on this appeal relate to the second count solely, claim being made that the Deadly Weapons Act upon which this count was based is repugnant to amendment XIV, Constitution of the United States, as well as to section 11, article I, Constitution of California, therefore that the enactment is unconstitutional; further, that it is in contravention of section 2, article VI, of the federal Constitution. It is also claimed that section 1983 of the Code of Civil Procedure, fixing the burden of proving citizenship upon an individual charged, as an alien, with having done an act prohibited to that class, is unconstitutional within the terms of the Fourteenth Amendment, which prohibits any state from denying "to any person within its jurisdiction the equal protection of the laws". This last contention raises no question in the present case for the People did not rely upon this rule governing burden of proof, but offered affirmative evidence tending to show that defendant was an alien, that he had declared his intention to become a citizen and that he had been denied the privilege of citizenship by order of the District Court of the United States sitting in New York in 1931. This showing was made by means of authenticated copies of court records properly admitted in evidence over defendant's objection.

We now consider the objection that the Deadly Weapons Act by its terms contravenes the provisions of amendment XIV of the federal Constitution, and find that this objection, with others grounded upon divers constitutional provisions, was before our Supreme Court in *In re Rameriz,* 193 Cal. 633 [226 Pac. 914, 34 A. L. R. 51], and there decided adversely to appellant's contention in an exhaustive opinion written by Mr. Justice Lawlor. The reasoning of that case, pages 649, 650, seems applicable to the one at bar. " 'Police power is the power inherent in a government to enact laws, within constitutional limits, to protect the order, safety, health, morals and general welfare of society.' (12 C. J. 904.) It is a well-recognized function

of the legislature in the exercise of the police power to restrain dangerous practices · (Id. 916) and to regulate the carrying and use of firearms and other weapons in the interest of the public safety (Id. 917). In our opinion the legislation constitutes a proper exercise of the police power and is not invalid under the fourteenth amendment. The purpose of the act is to conserve the public welfare, to prevent any interference with the means of common defense in time of peace or war, to insure the public safety by preventing the unlawful use of firearms." See, also, comments of the court on pages 645, 646, quoting from the case of *State* v. *Rheaume,* 80 N. H. 319 [116 Atl. 758].

Section 11, article I, Constitution of California, reads as follows: "All laws of a general nature shall have a uniform operation," and counsel for appellant argues that section 2 of the Deadly Weapons Act violates this rule, it being claimed, in effect, as it was in *People* v. *James,* 71 Cal. App. 374, 378 [235 Pac. 81], "that the classification here adopted is arbitrary, unreasonable, and not based upon any natural, intrinsic or constitutional distinction". In that case the claim is disposed of by reference to the Rameriz case, *supra,* and to the case of *Patsone* v. *Pennsylvania,* 232 U. S. 138, (34 Sup. Ct. 282, 58 L. Ed. 539; see, also, Rose's U. S. Notes), where Holmes, J., writing the opinion, said that " 'a state may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil is to be feared it properly may be picked out. A lack of abstract symmetry does not matter. The question is a practical one dependent upon experience. . . . It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named.' (*Miller* v. *Wilson,* 236 U. S. 373 [L. R. A. 1915F, 829, 59 L. Ed. 628, 35 Sup. Ct. 342]; see, also, Rose's U. S. Notes; *Armour & Co.* v. *North Dakota,* 240 U. S. 510, 517 [Ann. Cas. 1916D, 548, 60 L. Ed. 771, 36 Sup. Ct. 440].)"

In *People* v. *Smith,* 36 Cal. App. 88, page 90 [171 Pac. 696], it is said such a law "operates uniformly, upon all persons in the same category, and there is a reasonable basis for the classification. Therefore, it is not objectionable as class legislation." (See, also, *People* v. *Bertolani,*

69 Cal. App. 137 [230 Pac. 675]; *People* v. *Dawson,* 210 Cal. 366 [292 Pac. 267].)

The last remaining contention of appellant may be summed up as follows: By section 2, article VI, United States Constitution, judges in every state are bound by treaties negotiated by the national government, anything in the Constitution or laws of any state to the contrary notwithstanding. Therefore, taking cognizance of the provisions of the treaty of 1871 between the United States and the kingdom of Italy (17 U. S. Stats. at Large 845) supplemented by treaty of 1913 (38 U. S. Stats. at Large 1669), the courts in California should hold that section 2 of the Deadly Weapons Act (quoted below) prohibiting aliens from possessing revolvers can have no application to this defendant, an alien, a subject of the kingdom of Italy. As a basis for this argument, our attention is directed by appellant to the following language appearing in the treaty. "The citizens of each of the High Contracting Parties shall receive in the States and Territories of the other the most constant security and protection of their persons and property and for their rights, . . . and shall enjoy in this respect the same rights and privileges as are or shall be granted to nationals, provided that they submit themselves to the conditions imposed on the latter."

Section 2 of the Deadly Weapons Act reads as follows: "On and after the date upon which this act takes effect, no person not a citizen of the United States of America and no person who has been convicted of a felony under the laws of the United States, of the state of California, or any other state or any other government or country, or who is addicted to the use of any narcotic drug or drugs shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person. The terms 'pistol', 'revolver', and 'firearms capable of being concealed upon the person' as used in this act shall be construed to apply to and include all firearms having a barrel less than twelve inches in length. Any person who shall violate the provisions of this section shall be punishable by imprisonment in the state prison not exceeding five years, or in a county jail not exceeding one year or by fine not exceeding five hundred dollars, or by both fine and imprisonment."

"The question which here presents itself," to quote from appellant's brief, "is whether or not Section 2 of the Deadly Weapons Act conflicts with the provisions of the Treaty in effect between Italy and the United States; if it does, then Section 2 of article Six renders the Deadly Weapons Act unconstitutional, or at least inoperative as against Italian subjects during the existence and life of the treaty."

It clearly appears from the reasoning employed in *In re Rameriz, supra,* and *State* v. *Rheaume, supra,* also from *People* v. *Camperlingo,* 69 Cal. App. 466, 473 [231 Pac. 601], that the enactment by the California legislature, of this statute, the Deadly Weapons Act, and particularly of section 2 thereof was an exercise of the police power and we are asked to determine whether in the instant case it becomes abortive because of the quoted stipulation of the treaty with Italy.

Such an inquiry involves a survey of a wide field heretofore explored during many years, by some of the greatest minds that have brought honor to the legal profession, a field fertile with argument and one which has produced two schools of thought on the subject of how far, if at all, the treaty-making power of the national government may encroach upon or render nugatory police enactments of the states. For masterly presentations of divergent views on this question with discussion of cases, reference may be had to "Treaty-Making Powers of the United States", by Charles Henry Butler, and "Limitations of the Treaty-Making Power", by Henry St. George Tucker. A case involving a discussion of the treaty-making power and declaring emphatically that there are certain limitations upon it in relation to state legislation, appears in the first volume of California Reports—*People* v. *Naglee,* 1 Cal. 232, 247 [52 Am. Dec. 312], the reasoning of which has never been questioned in this state, so far as we know.

Respondent takes the position that the courts in determining questions raised by reliance upon treaty terms, may properly consider the nature and purpose of the treaty involved, and calls our attention to the following language appearing in the preamble, title and opening phrases of the treaty with Italy:

" 'Whereas a treaty of commerce and navigation between the United States of America and His Majesty the King of

Italy was concluded and signed by their respective pleni-potentiaries, at the City of Florence, on the 26th day of February, One Thousand Eight Hundred and Seventy-One, which treaty, being in the English and Italian language, is word for word as follows:

" 'Treaty of Commerce and Navigation between the United States and the Kingdom of Italy.

" 'The United States of America and His Majesty the King of Italy, desiring to extend and facilitate the relations of commerce and navigation between the two countries, have determined to conclude a treaty for that purpose . . . '

" (17 United States Statutes at Large, page 845.) "

It is argued that we have a right to consider that posses-sion of a revolver concealed beneath a cushion of a daven-port, has nothing to do with commerce or navigation. Re-gardless of the correctness of such a view, we are not prepared to say that, under the language of the treaty, designed as it was to promote commerce between the two nations, every right enjoyed by citizens shall belong also to aliens. It will be noted that in the treaty privileges were placed on the same footing as rights; equality as to both is secured to the alien by the phrase "shall enjoy in this respect the same rights and privileges as are or shall be granted to nationals"; but it has been held repeatedly that certain privileges which are extended by the state to nationals may be withheld from aliens. *Patsone* v. *Pennsyl-vania, supra,* which upheld the right of the state to prohibit aliens from killing wild game or owning weapons appro-priate for that use, while placing no such restriction upon Pennsylvania citizens, is an illustration. A more recent case is *Gizzarelli* v. *Presbrey,* 44 R. I. 333 [117 Atl. 359]. In both these cases defendant, a subject of Italy, invoked the identical language of the same treaty to secure his discharge, but without avail.

In the Gizzarelli case it was stated specifically that "authority to use the public highways as a common carrier of passengers for hire is not a right belonging to the individual, but is in the nature of a privilege". Since privileges may be withheld in the exercise of the police power without doing violence to the terms of the treaty, no good reason is apparent why certain rights may not, with equal justice and perhaps under more urgent necessity,

be reserved by that same power exclusively for citizens. As is said in the Gizzarelli case, "The test of such legislation is not whether there is a discrimination against aliens, but rather is there any proper basis for such discrimination." On this question we close by quoting Mr. Justice Lawlor, in *In re Rameriz, supra,* p. 630: "It cannot be assumed that the legislature did not have evidence before it, or that it did not have reasonable grounds to justify the legislation, as, for instance, that unnaturalized foreign-born persons and persons who have been convicted of a felony were more likely than citizens to unlawfully use firearms or engage in dangerous practices against the government in times of peace or war, or to resort to force in defiance of the law. To provide against such contingencies would plainly constitute a reasonable exercise of the police power."

The judgments and order appealed from are affirmed.

York, J., concurred.

Houser, Acting P. J., dissented.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 10, 1934.