[Crim. No. 21247. Second Dist., Div. Three. Oct. 26, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSE ANGEL RAPPARD, Defendant and Appellant.

COUNSEL

Randle H. Bate for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Russell Iungerich and Daniel W. McGovern, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**COBEY, J.**—Jose Angel Rappard appeals from a judgment pronounced upon the revocation of the probation previously granted him following his conviction (without judgment thereupon) of being an alien in possession of a concealable firearm and sentencing him for the offense. ▮ This

judgment is a final judgment of conviction and therefore appealable. (Pen. Code, § 1237, subd. 1; *People* v. *Delles,* 69 Cal.2d 906, 908-909 [73 Cal.Rptr. 389, 447 P.2d 629].)

The sole question presented for decision is whether the statutory prohibition of aliens from owning or possessing concealable firearms (Pen. Code, § 12021, subd. (a)[1]) constitutes a denial of equal protection of the law under the United States and California Constitutions. (See U.S. Const., 14th Amend.; Cal. Const., art. I, § § 11, 21.)

■ It is well settled that the protection afforded by the Fourteenth Amendment's prohibition against a state's denial of equal protection of the law to "any person" within its jurisdiction extends to aliens as well as citizens of the United States. (See *Graham* v. *Richardson,* 403 U.S. 365, 371 [29 L.Ed.2d 534, 541, 91 S.Ct. 1848].) ■ Since classifications based upon alienage, like those predicated upon nationality or race, are inherently suspect and subject to close judicial scrutiny (*id.* at p. 372 [29 L.Ed.2d at pp. 541-542]; *Rafaelli* v. *Committee of Bar Examiners,* 7 Cal.3d 288, 292 [101 Cal.Rptr. 896, 496 P.2d 1264]) we must invoke the following strict standard when reviewing a discriminatory statute based upon alienage: " 'Not only must the classification reasonably relate to the purposes of the law, but also the state must bear the burden of establishing that the classification constitutes a necessary means of accomplishing a legitimate state interest, and that the law serves to promote a compelling state interest.' (Fns. omitted.)" (*Raffaelli* v. *Committee of Bar Examiners, supra,* 7 Cal.3d at pp. 295-296, quoting *Purdy & Fitzpatrick* v. *State of California,* 71 Cal.2d 566, 579 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].)

The People apparently contend that this statute is the necessary means of promoting the compelling state interest of public safety. They predicate this contention on the proposition that the possession of concealable firearms by aliens is inherently dangerous to public safety. This proposition, however, has been rejected by the California courts, which have recognized that there are no rational grounds for believing that all residents who are not also citizens are ipso facto uncommitted to peaceful and lawful behavior. (See, e.g., *Raffaelli* v. *Committee of Bar Examiners, supra,* 7 Cal.

---

[1]Penal Code section 12021, subdivision (a), reads in relevant part as follows: "Any person who is not a citizen of the United States . . . who owns or has in his possession or under his custody or control any pistol, revolver, or other firearm capable of being concealed upon the person is guilty of a public offense, and shall be punishable by imprisonment in the state prison not exceeding 15 years, or in a county jail not exceeding one year or by a fine not exceeding five hundred dollars ($500), or by both."

3d at p. 298.) "It is common knowledge that several million aliens are living in this country and that the vast majority are peaceful and law abiding. Undoubtedly, many are serving or have children serving in the armed forces. Consequently, to categorically hold that every alien who is intentionally in possession of a concealable weapon, regardless of the reason, is guilty of an offense inherently dangerous to human life . . . would manifestly lead to unjust and even absurd results. . . . [A] person does not . . . show a tendency toward crime simply because he is not a citizen of this country." (*People* v. *Lovato*, 258 Cal.App.2d 290, 293, 296 [65 Cal.Rptr. 638]; see also *Raffaelli* v. *Committee of Bar Examiners, supra*, 7 Cal.3d at p. 298, and *People* v. *Satchell*, 6 Cal.3d 28, 38-39 [98 Cal.Rptr. 33, 489 P.2d 1361], approving the quoted reasoning of *Lovato*.)

In short, the classification of the statute—alienage—has no reasonable relationship to the threat to public safety which Penal Code section 12021 was ostensibly designed to prevent. Any classification which treats all aliens as dangerous and all United States citizens as trustworthy rests upon a very questionable basis. (Cf. *Purdy & Fitzpatrick* v. *State of California, supra*, 71 Cal.2d 566, 582.) We conclude, therefore, that the People have not sustained their burden of establishing that the classification— based as it is upon the suspect factor of alienage—not only promotes a compelling interest which justifies the law but that the distinctions drawn by the law are necessary to further its purpose. (See *Raffaelli* v. *Committee of Bar Examiners, supra*, 7 Cal.3d at p. 301.) Classification based upon alienage, as Justice Mosk said, ". . . is the lingering vestige of a xenophobic attitude which . . . should now be allowed to join those [other] anachronistic classifications among the crumbled pedestals of history." (*Id.* at p. 291.)

The People and our dissenting colleague rely, nevertheless, upon *In re Rameriz*, 193 Cal. 633 [226 P. 914, 34 A.L.R. 51], a 1924 California Supreme Court decision which upheld this same statute against an equal protection challenge. This case is not controlling for two reasons. First, as the People admit, some of the grounds upon which *Rameriz'* conclusion of constitutionality rested have been explicitly rejected in *Raffaelli* as valid grounds for distinguishing between citizens and aliens. (Compare *In re Rameriz, supra*, at p. 645 with *Raffaelli* v. *Committee of Bar Examiners, supra*, 7 Cal.3d at pp. 296-300.) Second, recent developments in the law of equal protection, confirmed in *Takahashi* v. *Fish Comm'n.*, 334 U.S. 410 [92 L.Ed. 1478, 68 S.Ct. 1138], dictate that a stricter standard of judicial review than the permissive rational basis test used in *Rameriz*

be applied to classifications based upon the suspect factor of alienage.[2] (See *Purdy & Fitzpatrick* v. *State of California, supra,* 71 Cal.2d 566, 582; see also, *Graham* v. *Richardson, supra,* 403 U.S. 365; *Truax* v. *Raich,* 239 U.S. 33 [60 L.Ed. 131, 36 S.Ct. 7]; *Yick Wo* v. *Hopkins,* 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064].)

Accordingly, Penal Code section 12021, as it applies to aliens, is declared unconstitutional. The judgment is reversed.

Ford, P. J., concurred.

**ALLPORT, J.**—I dissent.

The statute in question has been held constitutional in *In re Rameriz,* 193 Cal. 633 [226 P. 914, 34 A.L.R. 51], *People* v. *Cannizzaro,* 138 Cal. App. 28 [31 P.2d 1066], and *People* v. *Cruz,* 113 Cal.App. 519 [298 P. 556]. In *Rameriz, supra,* the Supreme Court said at pages 649-650: "It may safely be assumed that in a general sense the reasons that induced legislation involved in the case at bar exerted an influence in the adoption of the enactments considered in the foregoing authorities. If rights in land may be denied to aliens by the state there would seem no reason why in the exercise of its police power it might not also protect itself against the ownership, traffic in and use of firearms by aliens. This inhibition might well tend to conserve peace and quiet, and in times of war as well as of peace serve to avoid the injection of such issues into the international relations of the federal government.

" 'Police power is the power inherent in a government to enact laws, within constitutional limits, to protect the order, safety, health, morals and general welfare of society.' (12 C. J. 904.) It is a well-recognized function of the legislature in the exercise of the police power to restrain dangerous practices (*id.* 916) and to regulate the carrying and use of firearms and other weapons in the interest of the public safety (*id.* 917).

---

[2] In this connection we note that our dissenting colleague includes in his first quotation from *Rameriz* the following statement: "If rights in land may be denied to aliens by the state there would seem no reason why in the exercise of its police power it might not also protect itself against the ownership, traffic in and use of firearms by aliens." Yet, our alien land law, referred to in the quotation, was declared unconstitutional by our Supreme Court as violative of the equal protection clause of the Fourteenth Amendment to the United States Constitution over 20 years ago on a rationale essentially identical to that we rely upon here. (See *Sei Fujii* v. *State of California,* 38 Cal.2d 718, 728 [242 P.2d 617].)

As regards the last paragraph of our dissenting colleague's quotation from *Rameriz,* we further note that much of the claimed justification for the discrimination against aliens embodied in the statute before us was, as we have already indicated, expressly rejected in *Raffaelli, supra,* at pages 296-298 of 7 Cal.3d 288.

"In our opinion the legislation constitutes a proper exercise of the police power and is not invalid under the Fourteenth Amendment. The purpose of the act is to conserve the public welfare, to prevent any interference with the means of common defense in times of peace or war, to insure the public safety by preventing the unlawful use of firearms. It cannot be assumed that the legislature did not have evidence before it, or that it did not have reasonable grounds to justify the legislation, as, for instance, that un-naturalized foreign-born persons and persons who have been convicted of a felony were more likely than citizens to unlawfully use firearms or engage in dangerous practices against the government in times of peace or war, or to resort to force in defiance of the law. To provide against such contingencies would plainly constitute a reasonable exercise of the police power."

To hold otherwise would require this court to not only run contra to established legal authority, but to indulge in the oft condemned practice of judicial legislation. In *Rameriz, supra,* our Supreme Court quoted with approval from *Patsone* v. *Pennsylvania,* 232 U.S. 138 [58 L.Ed. 539, 34 S.Ct. 281] and *State* v. *Rheaume,* 80 N.H. 319 [116 A. 758] as follows: "Concerning the question of discrimination, the decision in *Patsone* v. *Pennsylvania, supra,* declared: 'The discrimination undoubtedly presents a more difficult question. But we start with the general consideration that a state may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. A lack of abstract symmetry does not matter. The question is a practical one dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named. . . . The question therefore narrows itself to whether this court can say that the Legislature of Pennsylvania was not warranted in assuming as its premise for the law that resident unnaturalized aliens were the peculiar source of the evil that it desired to prevent. . . . Obviously the question so stated is one of local experience on which this court ought to be very slow to declare that the state legislature was wrong in its facts.' " (P. 643.)

"It was said in *State* v. *Rheaume, supra:* 'Classifications distinguishing between citizens and aliens have, not infrequently, been the basis of regulations under the police power of the states. . . . Aliens are under no special constitutional protection which forbids a classification otherwise justified simply because the limitation of the class falls along the lines of

nationality. That would be requiring a higher degree of protection for aliens as a class than for similar classes of American citizens. . . . It therefore remains to be considered whether there is such a relation between the restriction as to the alien and the public safety as to warrant the classification in the present case. . . . That explosives and firearms are proper subjects of regulation is self-evident. The Legislature was dealing with subject-matters of great inherent danger to the public. . . . It was an incident to such a system that a classification should be made, based on domicile, allegiance, duty, habit, temperament, and other characteristics which distinguish the citizen and applicant for citizenship from the alien who has manifested no desire or intention to bind himself to support the government. Citizens as a class have more settled domiciles, and are better known to the local police officials, while the sojourn of aliens in this country, in theory, and usually in practice, is temporary, and their abode, while here, capricious and uncertain. Citizens, by means of taxation, bear the expense of the government and of police protection, while the alien does not necessarily pay taxes or share any part of the public burden. Native citizens are justly presumed to be imbued with a natural allegiance to their government which unnaturalized foreigners do not possess. The former inherit a knowledge and reverence for our institutions, while the latter as a class do not understand our customs or laws, or enter into the spirit of our social organization. Or, passing more directly to the use of firearms, the citizen has an obligation to defend the state, while the alien has none. The citizen is required to assist in maintenance of order, the enforcement of law, and the arrest of wrongdoers in some instances. It is clear that there exists a reasonable and substantial basis for the classification.' " (P. 645.)

If, as stated by the majority, "recent developments in the law of equal protection . . . dictate a stricter standard of judicial review" be applied in the instant case than that utilized in *Rameriz,* such standard should be established by current legislative action or Supreme Court mandate in the field of deadly weapons control.

I would affirm the judgment.

Respondent's petition for a hearing by the Supreme Court was denied December 20, 1972.